The effect of the "spendthrift" clause in favor of defendants is sought to be sustained by the provisions of Section 9398-1, General Code. It is sufficient to say that by definite provisions of Section 9398-2, General Code, "the provisions of Section 9398-1 shall not impair or affect the rights of creditors under Section 9394 of the General Code."

For these reasons, the creditors are entitled to recover to the extent hereinbefore indicated.

A decree may be entered by the Court of Appeals, the appropriate amounts being determined according to this opinion.

*Decree accordingly.*

HILDEBRANT and MATTHEWS, JJ., concur.

ROSS, P. J., HILDEBRANT and MATTHEWS, JJ., of the First Appellate District, sitting by designation in the Eighth Appellate District.

THE UNITED STATES BUNG MFG. Co., APPELLANT, *v.* CITY OF CINCINNATI, APPELLEE.

(No. 6277—Decided July 12, 1943.)

*Messrs. Bettinger, Schmitt & Kreis,* for appellant.
*Mr. John D. Ellis* and *Mr. Edward F. Alexander,* for appellee.

MATTHEWS, J.   The question developed by the trial of this appeal on questions of law and fact is whether the plaintiff, a taxpayer, has established a right to an injunction on the ground that the defendant will, unless restrained, commit an ''abuse of its corporate powers'' within the meaning of that phrase as used in Section 4311, General Code. The plaintiff alleges in its petition

that the city council has passed a resolution authorizing the United States to construct a flood wall in West Eighth street, a public street in the city of Cincinnati, and will permit the structure to be built, unless restrained; that such flood wall will constitute a permanent obstruction of the street and a diversion from the use for which the street is held by the defendant in trust for the public; that the plaintiff has demanded in writing that the city solicitor institute an action to enjoin this abuse of corporate power; that the city solicitor has refused; and that this action was brought after such refusal. Although not expressly alleged it is manifest that the alleged right which the plaintiff seeks to assert is not its private right, but rather the right of the body politic, and the authority for so doing is found in Section 4314, General Code.

As there is no substantial dispute as to the facts, we will not concern ourselves with the specific issues raised by the pleadings other than to say that they were adequate for the development of the facts.

It appears that prior to 1870 the west terminus of Eighth street was at the west line of Evans street In that year the owner of the land lying to the west dedicated a strip eighty feet wide to the use of the public so that Eighth street could be projected westwardly several hundred feet. The dedication was accepted by the city of Cincinnati and it became a part of Eighth street which extends across the basin of the city of Cincinnati to the hills on either side, and is now a part of the transcontinental highway known as the Atlantic and Pacific highway.

Mill creek, a tributary of the Ohio river, crosses Eighth street several hundred feet to the east of the section that was dedicated in 1870. It is a shallow stream which overflows its banks when water from the Ohio river backs up, covering with water and rendering

impassable Eighth street at its original grade. A bridge or viaduct was constructed early on Eighth street spanning Mill creek itself and a considerable part of the flood area on either side. It was found that the approaches to the original viaduct were flooded at times, and by 1926 it had also become inadequate to accommodate the traffic. Because of this situation the city, the county, and the state co-operated to improve Eighth street, so that it would take care of the traffic and be available all the time. As the result of the co-operation, the county commissioners built a concrete viaduct extending from McLean avenue on the east to Burns street on the west. It was seventy feet wide (much wider than the original viaduct) and much longer. The western end was built on the section of Eighth street that was dedicated in 1870. Some of the abutting property owners on that section had improved their property with reference to the existing grade and as this viaduct was about 30 feet above that grade and was supported by large concrete pillars, their right of ingress and egress was affected. Because of this, the county instituted an action against the property owners to appropriate their rights and assess the damage to them resulting from the construction of the viaduct in front of their premises. They were compensated in an amount fixed by agreement or judgment of court.

From Evans street westwardly for a distance of 450 feet, the viaduct was supported by fifteen concrete pillars along the center line of Eighth street and an equal number on a line near the sides of the viaduct, and these pillars were connected by arches supporting the superstructure. The pillars along the center line were five feet, two inches, measured transversely of the center line and the side pillars were three feet, six inches. The other horizontal dimension varied from two feet,

six inches to five feet, four inches. They extended upward to the viaduct floor which was 30 feet above at Evans street, but sloped downward so that at a point 450 feet west it was 21 feet above. The floor above and these pillars formed a subway that came to an end at the west end of the viaduct.

No proceeding to vacate any part of Eighth street was instituted. Although not a part of the original plan, a ramp was built from a certain point on this section whereby traffic could proceed from the viaduct down the ramp to a public street, to the west, and thence to this portion of Eighth street under the viaduct, which has been maintained as a public street and used as a means of access to the abutting property, although some have entrances from the viaduct. The space really formed two streets—one, 21 feet wide south of the center pillars, and one of equal width north of those pillars.

As a result of the flood of 1937, the desirability of some protection of the people and property in the Mill creek valley against the recurrence of such a disaster became apparent. A flood wall across that valley to prevent water from the Ohio river from backing up was decided upon. Under the plan, the city of Cincinnati was to furnish the site and the United States was to build it. The location first selected required the acquisition of property from private owners, including the plaintiff. It was found that the cost would be excessive in the view of the city officials. The result was that the city officials concluded to connect the center pillars supporting the viaduct with a concrete wall twelve feet high and about two feet thick, and use it as a part of the flood wall, thereby making it unnecessary to acquire certain property from the owners in that vicinity The city council passed a resolution relocating the flood wall at that point and authorizing the

United States to proceed with the construction. It should be said here that a gate was provided so that traffic could pass from one side of the wall to the other and the gate would be closed only during floods requiring its closing, but the closing of the space between the pillars will prevent using the street as freely for turning and maneuvering vehicles.

Now should this use of the street be enjoined at the suit of a taxpayer?

By the original dedication and its acceptance the city of Cincinnati acquired the fee simple title in trust for street purposes. The beneficiary of that trust was the public and not the dedicator or his successors in title of the abutting property. As long as it used it for street purposes its title could not be questioned by any one. The right of the abutter was a mere possibility of reverter upon finding of the fact by the city—the trustee—that it was no longer used or useful for street purposes. It owed the duty to the public imposed by statute to keep the street open, in repair, and free from nuisance. It owed no such duty to the dedicator; and it owed no duty to the public to maintain the space open for travel for its entire width. Its title would not have been in jeopardy or liability incurred to the public had it maintained a street for travel at the original grade at a minimum expense instead of expending the large amount required to construct viaducts to raise the traveled portion above the flood level. And had it done this by constructing an embankment or levee instead of a viaduct no one would have suggested that it had abandoned the street or diverted the land to another use notwithstanding it would have completely excluded the public from its use at the original street level. It would have been an excessive use beyond the terms of the original dedication, entitling the abutting own-

ers to compensation for interference with access, but the property originally dedicated would still be used for street purposes. And the fact that the embankment upon which the road was constructed would also serve as a flood wall would not change the legal aspect, even though it should appear that the public authorities had its utility as a flood wall in mind at the time.

And then this almost complete title by virtue of the original acquisition has been added to by payment to the abutting property owners when the viaduct was constructed.

It is thus seen that the plaintiff is seeking to enjoin the use for a public purpose of property, the title to which is almost complete in the public; and this injunction, if it is granted, must be on the ground that it involves an abuse of power.

Now will the joining of these concrete columns by the described concrete wall constitute a street purpose? The purpose is not described in such terms. It seems usually to have been referred to as ''The Mill Creek Barrier Dam Project.'' To determine whether the members of the city council actually considered specifically the relation it would bear to the use of Eighth street as a street would require resort to psychoanalysis, which is beyond the judicial function. We can consider the meaning of what was said and done under the circumstances and the natural effect of the accomplishment of the plan.

We can see that the purpose was to confine flood water to the area south of the flood wall, so that the area north of the wall would not be inundated. By this means a part of the area would be saved from the ravages of the flood and retained for use during the flood, whereas, in the absence of the wall, the entire area during a flood would be covered with water and its use by the private owners and the public ex-

cluded. Eighth street was within this area and subject to be rendered unusable as a street at any time. If the flood wall were located north of Eighth street the entire street would have remained in the flood area. Should it be located entirely south, Eighth street for its entire width would be freed from the hazard of inundation. The public authorities decided to do neither, but to place the wall along the middle line of the street so that the north half would be available under the viaduct at all times and the south half available as it had always been, that is, subject to the hazard of floods. We cannot say that this wall will not serve a purpose incidental to the use of Eighth street as a street.

So upon the completion of this wall, we find that the defendant has improved this land held by it in trust for street purposes, that traffic can proceed over the viaduct at all times for a width of seventy feet and under the viaduct at all times for a width of approximately the same width, subject to the hazard of floods on the south half and on the north half free of the hazard of floods.

In the light of these facts can it be said that the defendant has diverted, or contemplates diverting, this land to purposes other than street purposes, or has abused corporate power by violating the trust upon which it holds title? We do not think so.

In 21 Ohio Jurisprudence, 1046 *et seq.*, it is said:

"Inconvenience to third persons and to the public at large is also to be considered in determining an application for an injunction. An injunction will not be granted where it might be a serious detriment to the public without corresponding benefit to the plaintiff. For this reason a taxpayer's application for an injunction against the issuance of bonds by a city may be denied where it does not appear that he will suffer

any serious injury from such denial, while serious and possibly irreparable loss to the city would attend the allowance of the injunction.

"The avoidance of inconvenience and loss to the public is, of course, the basis of the rule previously stated, requiring special caution in granting injunctions interfering with or suspending the operation of important public works. An important public improvement, the prevention or postponement of which will greatly imperil, inconvenience, or injure the public, ought not to be enjoined on application of one whose injury or inconvenience if the injunction is denied will be slight or doubtful, or capable of being adequately compensated at law."

The rule is recognized generally, as is shown by the text in 28 American Jurisprudence, 254:

"The paramount interests of the public may have some bearing on the matter of granting injunctive relief to protect private rights. The fact that an important public interest would be prejudiced by the granting of the injunction sought in a particular case may be a compelling reason for denying the injunction. The existence of such public interest will, at least, furnish a court of equity sufficient ground for exercising its discretion to refuse the remedy, and the court would seem bound to stay its hand in the public interest, where it reasonably appears that the private right will not suffer by the refusal of the writ or order, where the damage to the complainant from denying the injunction will be slight, where the right invaded is merely a technical or unsubstantial one or where the injury is one which can readily be compensated in damages, while the issuance of the writ or order may or would occasion public inconvenience. Courts will not enjoin the construction or use of public utilities and improvements at the suit of private individuals, unless

the damage is both serious in amount and irreparable in character.''

Thus it is seen that a court of equity would not enjoin a great and desirable public improvement to protect a mere technical or unsubstantial private right and it seems to us that there are stronger reasons for denying an injunction where no private right is asserted.

The evidence in this case does not convince us that any property right of the original dedicator or abutting property owners or successors to his rights has been violated by what has been done or what is contemplated. It certainly does not convince us that the defendant has abused or contemplates abusing its corporate power.

We take notice of other specific objections to the maintenance of this action in the form in which it is prosecuted, but as we have found on the merits for the defendant, we do not pass upon those objections.

For these reasons, the court finds for the defendant. A judgment entry may be presented dismissing the action at the cost of the plaintiff.

*Decree accordingly.*

Ross, P. J., and Hildebrant, J., concur.