RITE AID OF OHIO, INC., Appellant,

v.

MARC'S VARIETY STORE, INC. et al., Appellees.

[Cite as *Rite Aid of Ohio, Inc. v. Marc's Variety Store, Inc.* (1994), 93 Ohio App.3d 407.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 64771.

Decided March 7, 1994.

*Kelley, McCann & Livingstone, Steven A. Goldfarb, David H. Wallace* and *Joseph M. Miller,* for appellant.

*Schulman, Schulman & Meros* and *Jack M. Schulman,* for appellee Marc's Variety Store, Inc.

*Thompson, Hine & Flory* and *Daniel R. Warren,* for appellees RMS Investment Corp. and Albert Ratner, trustee.

PORTER, Judge.

Plaintiff-appellant, Rite Aid of Ohio, Inc. ("Rite Aid"), appeals from the trial court's denial of injunctive relief which would have prohibited defendant-appellee, Marc's Variety Store, Inc. ("Marc's") from operating a Marc's store in the Brookgate Shopping Center in Brook Park, Ohio. Rite Aid claims that the trial

court erred in not enjoining Marc's operation by giving effect to a prior lease restriction which provided that lessee Rite Aid would have "the exclusive privilege for the operation of a Drug Store in the Shopping Center." Marc's carries health and beauty aids similar to those of Rite Aid but does not have a pharmacy for dispensing prescription drugs. The case therefore turns on whether or not Marc's operates a "Drug Store" in violation of Rite Aid's exclusive-use provision, although Marc's does not offer prescription drugs. We find the trial court correctly denied the injunctive relief and properly granted defendants-appellees declaratory judgment for the reasons set forth below.

Rite Aid, as lessee, operates a 9,600 square foot store with a pharmacy at the Brookgate Shopping Center under a 1981 lease with defendant RMS Investment Corp. ("RMS"). The lease gave Marshall Drug, Rite Aid's predecessor, the right to operate a "retail drug and variety store" on the premises. Paragraph 8(a) of the lease, known as the "use clause," listed items that Rite Aid could sell:

"[P]roprietary and ethical drugs, health and beauty aids, sundries, tobacco products and smoking supplies, liquor, beer and wine, * * * school supplies, housewares, small electrical appliances, toys, recreation equipment, cameras, photographic supplies and film processing, food for off-premise and on-premises consumption, books, newspapers, and magazines, and items kindred to the foregoing."

Paragraph 8(g) of the lease (the "exclusive-use clause") granted Rite Aid "the exclusive privilege for the operation of a Drug Store in the Shopping Center." At the time Rite Aid's predecessor entered into the Lease, the anchor tenant at Brookgate was Zayre's, a general merchandise store selling every item listed in Paragraph 8(a) of the Lease, except prescription drugs. Another tenant was the Bi–Rite grocery store (now Food Center), which also sold items listed in Paragraph 8(a) of the Lease, but not prescription drugs, right up to the present. By 1988, Zayre's had been replaced by Ames, another general merchandise store, which sold the same items as does Rite Aid, except prescription drugs.

Rite Aid has never claimed that Zayre's, Ames and Bi–Rite were drug stores or violated its exclusive use privilege within the meaning of Paragraph 8(g) of the lease, even though they offered the same items as Rite Aid, except for prescription drugs.

In November 1990, the Ames store went out of business. The 45,000 square feet of anchor space remained unoccupied until October 1992, when Marc's opened. Accordingly, Brookgate Shopping Center was without an anchor tenant for nearly two years, from November 1990 until October, 1992, which had a deleterious effect on the general success of the shopping center and the business tenants.

Marc's entered into a lease with RMS on July 30, 1992, to open a 45,000 square foot store in the anchor space and began to build out its new space immediately thereafter. Starting in early August 1992, Marc's hung a banner in the window announcing its opening and that it was accepting applications for employment. RMS expended funds for repairs and improvements to the premises as well. Marc's hired one hundred twenty-five employees to staff the new store. Marc's opened its doors to the public on October 1, 1992.

Total sales at Rite Aid's Brookgate drug store consisted of ninety percent pharmacy and health and beauty aid items and ten percent food and general merchandise items (housewares, paper products, greeting cards, household chemicals, batteries, etc.), liquor and cigarettes.

The Marc's store does not have a pharmacy or a pharmacist. Accordingly, Marc's does not call its store a "drug store," does not advertise itself as a "drug store," and does not sell prescription drugs at the store. Marc's principal product category break-down chain-wide, by purchases, is food (forty-one percent), general merchandise, including tobacco (thirty-five percent), and health and beauty aids (twenty-three percent). The allocation of store space within Marc's Brookgate store is forty-five percent devoted to general merchandise, twenty-seven percent to food, and fourteen and one-half percent to health and beauty aids.

On September 30, 1992, the day before the grand opening of Marc's, Rite Aid filed a complaint against the defendants, seeking preliminary and permanent injunctive relief which would prohibit Marc's from operating a drug store at Brookgate. Rite Aid's motion for a temporary restraining order was denied, but expedited discovery was allowed. By agreement of the parties, the hearing on the preliminary injunction was consolidated with the hearing on the merits and set for October 15, 1992.

After a four-day evidentiary hearing from October 15 to October 19, 1992, the trial court took the matter under advisement and the parties submitted findings of fact and conclusions of law. On November 6, 1992, the court found for defendants-appellees and filed findings of fact and conclusions of law (cited herein as "Opinion"). A timely notice of appeal was filed.

We will address Rite Aid's three assignments of error together taking up the issues in the order asserted:

"I. The trial court committed reversible error by failing to give effect to the parties' intent and the obvious purpose of the Rite Aid lease which is to prohibit competition by a direct competitor in the drugstore industry. (Findings of Fact and Conclusions of Law, at 6–9; plaintiff's Exhibit 2, at 6.)

"II.   The trial court committed reversible error by ruling that under Ohio law a 'drug store' always contains a pharmacy.   (Findings of Fact and Conclusions of Law, at 8.)

"III.   The trial court's findings and conclusions regarding the other factors necessary to obtain injunctive relief were against the manifest weight of the evidence.   (Findings of Fact and Conclusions of Law, at 10–11; tr. 222–23, 224, 94; plaintiff's Exhibit 4, at 10.)"

Rite Aid argues that the trial court improperly denied its request for injunctive relief.

It is well established that "[t]he right to an injunction must be clear and the proof thereof clear and convincing * * *."  *White v. Long* (1967), 12 Ohio App.2d 136, 140, 41 O.O.2d 200, 202, 231 N.E.2d 337, 340; *S. Ohio Bank v. S. Ohio Savings Assn.* (1976), 51 Ohio App.2d 67, 69, 5 O.O.3d 183, 184, 366 N.E.2d 296, 298.   The parties have agreed in their briefs and stipulated at the hearing below that, to obtain the relief it seeks, Rite Aid must establish each of the following elements:

a.   Defendants committed a wrongful act;

b.   Plaintiff has no adequate remedy at law;

c.   The harm to plaintiff if the injunction does not issue clearly outweighs the harm which the injunction would do to the defendants and innocent third parties; and

d.   The public interest will be served by the granting of injunctive relief.

"The grant or denial of an injunction is solely within the trial court's discretion and, therefore, a reviewing court should not disturb the judgment of the trial court absent a showing of a clear abuse of discretion."  *Garono v. State* (1988), 37 Ohio St.3d 171, 173, 524 N.E.2d 496, 498, citing *Perkins v. Quaker City* (1956), 165 Ohio St. 120, 125, 59 O.O. 151, 153–154, 133 N.E.2d 595, 598.

Rite Aid does not attempt to define in its brief the lease term on which this appeal turns: "drug store."   Rite Aid contends that the term has a "broad meaning," but does not distinguish Marc's from the Ames or Bi–Rite stores which operated at Brookgate without objection by Rite Aid when it assumed the lease in 1988.

One of the practical difficulties for Rite Aid at trial was to construct a definition of "drug store" which was broad enough to include Marc's while at the same time excluding other grocery and general merchandise stores like Bi–Rite, Ames and Zayre's, which were similar to Marc's.  *E.g.*, Rite Aid's district supervisor defined "drug store" as "a store that has health and beauty aids, over-the-counter products, and other product lines within the confine of the store * * * regardless

of the relative percentages of each of those items." But, the supervisor conceded, that definition embraces grocery stores as well as general merchandisers. Ultimately, he acknowledged that what makes Rite Aid a drug store is the very thing which distinguishes it from Marc's:

"Q. Would it be correct to state that what makes Rite Aid a drug store is the fact that 90 percent of its sales are composed of prescriptions and health and beauty aids?

"A. In some cases, yes.

"Q. Would you say that would be true of this store at Brookgate?

"A. Yes."

Defendants pointedly argue that if "drug store" cannot be clearly defined and is given "a broad meaning," it would remove any limit on the scope of the lease's· exclusive-use clause. That construction would enable Rite Aid to exclude from Brookgate any store which competes with it in the sale of *any* of its product categories, thereby threatening RMS's ability to lease the center's anchor space. Defendants argue that Rite Aid's failure to offer a substantive definition of "drug store" is fatal to its claim.

Contrary to Rite Aid's "broad meaning" approach, the trial court correctly found that Ohio law requires that the language of the exclusive-use clauses should be narrowly construed. *Loblaw, Inc. v. Warren Plaza, Inc.* (1955), 163 Ohio St. 581, 592, 57 O.O. 10, 15, 127 N.E.2d 754, 760: "[A]ll doubts should be resolved against a possible construction thereof which would increase the restriction upon the use of such real estate." See, also, *Houk v. Ross* (1973), 34 Ohio St.2d 77, 91, 63 O.O.2d 119, 126–127, 296 N.E.2d 266, 275; *Bevy's Dry Cleaners & Shirt Laundry, Inc. v. Streble* (1965), 2 Ohio St.2d 250, 254, 31 O.O.2d 507, 509–510, 208 N.E.2d 528, 531.

Other rules of construction must also guide the court's interpretation of the contract. These have been recently stated in *The Toledo Group, Inc. v. Benton Industries, Inc.* (1993), 87 Ohio App.3d 798, 805, 623 N.E.2d 205, 209–210, as follows:

"The interpretation of a written contract is a matter of law for the court. *Alexander v. Buckeye Pipeline Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus. The purpose of contract construction is to effectuate the intent of the parties. *Skivolocki v. East Ohio Gas Co.* (1974), 38 Ohio St.2d 244, 67 O.O.2d 321, 313 N.E.2d 374, paragraph one of the syllabus. The intent of the parties is presumed to reside in the language they chose to employ in the agreement. *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph one of the syllabus. Common words

appearing in the written instrument will be given their plain and ordinary meaning unless manifest absurdity results or some other meaning is clearly evidenced from the face or overall contents of the instrument. *Alexander, supra,* at paragraph two of the syllabus."

We believe that the cases Rite Aid cites as to the intention of the parties fall within the foregoing parameters. Intent is to be gleaned from the contract language used unless there is some ambiguity.

However, Rite Aid does not assert that the exclusive-use clause is ambiguous; indeed, Rite Aid filed a motion at trial to exclude extrinsic evidence on the ground that the term "drug store" was *not* ambiguous. But, if there were an ambiguity, it would have to be resolved in favor of a narrow construction rather than a broad one as the previous discussion displays.

■ The trial court relied in part on the statutory definition in Ohio law to support its conclusion that Marc's was not operating a drug store because it did not have a pharmacy. We believe such reasoning is sound.

Drug stores have been regulated by statute in Ohio for many years. Under R.C. 4301.01(B)(16), 4729.27 and 4729.36, a "drug store" must be "under the management or control of a legally registered pharmacist"; otherwise, it may not call itself a "drug store." The "legislative context" of these statutes is compelling because they prohibit any entity from holding itself out as a drug store unless it has a pharmacy operated by a registered pharmacist.

■ It was entirely proper for the trial court to make use of statutory meanings which are in effect when a contract is made, if no other meaning is supplied by the contract itself. For example, in *Garlick v. McFarland* (1953), 159 Ohio St. 539, 545–546, 50 O.O. 445, 447–448, 113 N.E.2d 92, 95, the court construed an insurance policy's use of the words "owner" and "ownership" by incorporating Ohio's statutory requirements for proof of ownership of motor vehicles. The court explained:

"It is elementary that the law of the place where a contract is made enters into and becomes a part of the contract, and that the contract must be construed as though the law were written out in full therein." See, also, *Jirousek v. Prudential Ins. Co.* (1971), 27 Ohio St.2d 62, 63–65, 56 O.O.2d 34, 35–37, 271 N.E.2d 866, 867–868.

The same reasoning requires application of the pertinent statutory requirements here.

The trial court also found that Ohio's statutory definition of "drug store," as containing a pharmacy or offering prescription drugs, was consistent with the

common meaning of "drug store" contained in seventeen dictionary definitions introduced by defendants.

■ Rite Aid argues that dictionaries should not be considered because they "do not identify the parties' intent * * *." However, the courts are bound to construe contract language based on the ordinary, everyday meaning of words. See *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146. It is common practice to resort to dictionaries as the best source for establishing the ordinary meaning of contractual terms. *Andrews v. Tax Comm.* (1939), 135 Ohio St. 374, 376, 14 O.O. 250, 251, 21 N.E.2d 106, 107 (the definition of "candy" in Webster's Dictionary was common knowledge of which the court took judicial notice); *The Toledo Group, supra,* 87 Ohio App.3d at 805, 623 N.E.2d at 209 (reference to dictionary for definition of "similar" in confidentiality agreement).

■ Defendants argue that virtually every dictionary of the English language defines "drug store" as a store where prescriptions are filled, even if non-prescription items are also sold. Even some of the dictionary definitions cited by Rite Aid make reference to prescriptions and pharmacies.

We find that the dictionary authorities referenced display ample support for the trial court's conclusion that Marc's is not a "drug store" because it does not have a pharmacy in the common parlance of the English language.

The trial court properly distinguished the cases cited by Rite Aid which it claimed held that "drug stores" sold other items than prescription drugs. The trial court found that "Rite Aid * * * has not cited any case which holds that a store which does not have a pharmacy or a pharmacist is a drug store." On appeal, we find that Rite Aid's authorities simply stand for the unremarkable proposition that drug stores may sell other items than prescription drugs.

Rite Aid also relies on *Gillen–Crow Pharmacies, Inc. v. Mandzak* (1964), 8 Ohio Misc. 47, 37 O.O.2d 60, 220 N.E.2d 852, affirmed (1966) 5 Ohio St.2d 201, 34 O.O.2d 417, 215 N.E.2d 377. In *Gillen–Crow,* a restrictive-use clause prohibited the owner from leasing space "to any Drug Store, or any other business which sells drugs or prescriptions." Based on testimony from the participants in the lease negotiations, the court determined that the parties intended the term "drugs" to include non-prescription as well as pharmacy items (8 Ohio Misc. at 62–63, 37 O.O.2d at 68–69, 220 N.E.2d at 862–863). The *Gillen–Crow* court did not attempt to interpret the term "drug store" and therefore its decision has no relevance here.

■ Rite Aid claims that the lease should be interpreted in light of the surrounding circumstances to give effect to the intent of the parties, to wit, to preserve Rite Aid from direct competition. The history of the relationship does

not support this argument. When the original lease was entered in 1981, two other stores, Zayre's and Bi–Rite, already were selling all of the products which Rite Aid's predecessor was permitted to sell, *except* prescription drugs. It is also undisputed that when Rite Aid assumed the lease in 1988, Ames and Food Center (formerly Bi–Rite) were still selling all of those same products at Brookgate.

Rite Aid did not object to the fact that other Brookgate stores sold these non-pharmacy products. In 1988, Rite Aid also amended the lease so as to reduce the amount of space which it devoted to selling those same non-pharmacy products. Thus, the trial court took note that the "essential feature of a drug store, a pharmacy under the control of a licensed pharmacist, is absent at Marc's as it was at Zayre's, Ames and Bi–Rite."

■ Rite Aid's acquiescence in those stores' operation is evidence that it did not view the exclusive-drug-store-use provision as protection against competition in the sale of non-pharmacy items—that is, general merchandise, health and beauty aids, or the modest selection of food stuffs that Rite Aid carries. It is appropriate to construe use clauses consistently with the subsequent conduct of the parties, especially where (as here) such a construction would minimize the restriction on the free use of property. See *Fellow v. Tommy's* (Feb. 9, 1978), Cuyahoga App. No. 36978, unreported (lessor could not require tenant to operate pharmacy under use clause for drug store, when for the previous nine years the tenant had not had a pharmacist and the lessor had not complained).

The circumstances in which the lease was negotiated, and Rite Aid's conduct, give support to the trial court's conclusion that Marc's is not a "drug store" within the meaning of the lease.

The issue which the trial court properly addressed is whether Marc's is a "drug store" within the commonly understood meaning of the term. The exclusive-use provision guarantees Rite Aid freedom from competition by a drug store, not a discount merchandiser like Marc's. The rationale advanced by Rite Aid why it should be free from Marc's competition is not persuasive.

■ Rite Aid asserts that Marc's is a "drug chain." Rite Aid cites the 1991 issue of a trade publication called *Chain Drug Review,* which placed Marc's on a list of drug chains. However, the lease does not grant Rite Aid the exclusive privilege to operate a store which is part of a "drug chain" at Brookgate, but only the exclusive privilege to operate a "drug store." If Rite Aid's exclusive-use privilege was to prevent competition from other "drug store chains," then we presume appropriate language would have been inserted in the lease to effect that goal.

Furthermore, an executive in the shopping center business gave competent testimony that Marc's is not even a drug store chain, but is rather a "merchan-

dise discount" operation. As he explained, Marc's and Rite Aid would be different types of stores regardless of whether Marc's had a pharmacy because of their different sales mix.

■  Rite Aid argues that defendants have breached the lease because Marc's, under its current lease, has the right to operate a pharmacy at Brookgate *after* Rite Aid's lease expires in 2006. Should such an event occur, Rite Aid would have no contractual rights under the Lease at issue after the year 2006. Thus, this argument has no bearing on the present dispute.

Rite Aid argues that its store and Marc's sell "essentially identical" products and "emphasize the sale of the same categories of goods." But this argument was laid to rest by the express findings of the trial court which found that ninety percent of Rite Aid's sales were pharmacy, health and beauty aids, while ten percent was food and other miscellaneous items. Marc's chain-wide distribution is forty-one percent food, thirty-five percent general merchandise, and twenty-three percent health and beauty aids. The Brookgate store of Marc's does not sell prescription drugs, which account for fifty percent of Rite Aid's sales. Marc's also carries many grocery and general merchandise products, including those in a special close-out section, which Rite Aid does not carry.

There was substantial and credible evidence in terms of sales dollars, floor space and advertising, to disclose that Marc's heavily emphasizes groceries and general merchandise; these two categories, combined, account for only ten percent of Rite Aid's sales. Most of Rite Aid's non-pharmacy business consists of health and beauty aid items.

■  The trial court found on the balance of harm and inconvenience test that Rite Aid has not proved that it will be harmed if the injunction is not granted but that granting the injunction would cause substantial harm to defendants, innocent third parties and the public. The court had ample support for its finding. Granting the injunctive relief requested by Rite Aid would shut down the anchor tenant of a major shopping center, putting one hundred twenty-five people out of work and reducing traffic for the other satellite tenants.

Under the "comparative injury or balance of inconvenience rule," Ohio courts deny permanent injunctive relief where it would cause more harm that it would avoid or result in the impairment of an important public interest. *White v. Long* (1967), 12 Ohio App.2d 136, 140, 41 O.O.2d 200, 203, 231 N.E.2d 337, 340 (reversing injunction which adversely affected the public interest in the continued operation of a sewage facility); *United States Bung Mfg. Co. v. Cincinnati* (1943), 73 Ohio App. 80, 88–89, 28 O.O. 121, 124–125, 54 N.E.2d 432, 435 (dismissing action for injunction which would prevent construction of a flood wall).

The injunction sought by Rite Aid would harm RMS, Marc's and its employees, other Brookgate tenants and the community at large. The anchor tenancy stood vacant for two years. If Marc's is closed, RMS may never find another anchor (45,000 square feet) for the center. Indeed, if Rite Aid were given the power to exclude retailers which sell some combination of food, general merchandise, and health and beauty aids, regardless of whether they have a pharmacy, the pool of potential tenants for this anchor space would be severely limited and the harm to the Brookgate Shopping Center would be substantial.

The balance-of-harm analysis is an essential element of injunction relief. Unless a plaintiff can show that the balance of harm weighs in his favor, he is not entitled to an injunction but must find his relief in money damages. See *Richmond Hts. v. Bd. of Cty. Commrs.* (1960), 112 Ohio App. 272, 283, 11 O.O.2d 475, 482, 166 N.E.2d 143, 151.

Rite Aid's evidence of financial harm came from its store manager. He testified that the sales of Rite Aid's Brookgate store fell approximately twenty-five percent in the first two weeks of October 1992, immediately after Marc's opened. But he acknowledged that the store's sales fell by a similar percentage between September and October both in 1990 and 1991 when Marc's was not at the Center. This suggests that the decline was a seasonal phenomenon rather than the impact of the start-up operation of Marc's.

Other Rite Aid witnesses acknowledged (and the sales figures established) that the sales of its Brookgate store had declined substantially during the entire two years before Marc's opened while the anchor space was vacant. There was evidence to support the trial court's finding that Rite Aid and every other tenant in the Brookgate Shopping Center would suffer from the lack of an anchor tenant.

The trial court could properly find, as it did, from this evidence that the harm to defendants, third parties and the public outweighed any potential harm or injury to the plaintiff.

Given our holdings above, it is not necessary to address defendants' arguments of laches or collateral estoppel.

Summarizing, we find that the trial court's denial of an injunction is adequately supported by the evidence and the trial court did not abuse its discretion in making its ruling. Plaintiff's assignments of error are overruled.

*Judgment affirmed.*

SPELLACY, P.J., and BLACKMON, J., concur.