OPINION
{¶ 1} The Ohio Bureau of Workers' Compensation and its Administrator, William E. Mabe (collectively referred to as "the bureau"), defendants-appellants, appeal from the judgment of the Franklin County Court of Common Pleas, in which the court issued a declaratory judgment in favor of the Ohio Hospital Association (individually *Page 2 
"OHA") and Genesis HealthCare System (individually "Genesis"), plaintiffs-appellees (collectively "appellees"), and granted the motion for permanent injunction filed by appellees. Service Employees International Union District 1199, the Heath Care and Social Service Union, SEIU, has filed a brief of amicus curiae urging reversal of the trial court's decision.
 {¶ 2} The bureau's Health Partnership Program ("HPP" or "program") reimburses healthcare providers for treatment of injured workers. Participation in the HPP by the healthcare providers is voluntary and established by contracts between the providers and the bureau. The OHA is a non-profit association that represents various Ohio hospitals and healthcare systems that are members of the HPP. Genesis is a non-profit corporation that operates several healthcare operations and is a member of the OHA.
 {¶ 3} After various discussions with the providers, the bureau decided to institute a new fee plan ("plan") that decreased the reimbursement rates for HPP providers. The bureau gave providers official notification of the changes on September 1, 2005, and the changes were published in a provider bulletin and then incorporated into the Provider Billing and Reimbursement Manual ("provider manual"), both of which were distributed to the providers. The new plan was to be effective October 1, 2005.
 {¶ 4} One day before the plan was to go into effect, on September 30, 2005, appellees filed a declaratory judgment action against the bureau, alleging that, in order to change the reimbursement rates, the bureau must promulgate a "rule" under R.C. 119, not merely implement the changes through the publication of provider bulletins and provider manuals. Appellees also requested injunctive relief to enjoin the bureau from reimbursing the providers at the reduced reimbursement rates. *Page 3 
 {¶ 5} On December 8, 2005, the trial court issued a decision as to the request for declaratory judgment, finding that the bureau's fee plan must be promulgated as a rule pursuant to R.C. 119. On February 22, 2006, appellees filed a motion for permanent injunction. On May 8, 2006, the trial court issued a decision granting appellees' motion for a permanent injunction. The trial court journalized the decisions on May 16, 2006. The bureau appeals the judgment of the trial court, asserting the following three assignments of error:
 Assignment of Error 1:
 The Court below erred in granting declaratory and injunctive relief because under the doctrine of laches, OHA has sat on its rights too long to assert them now.
 Assignment of Error 2:
 The Court below erred in granting declaratory relief because the Bureau is not required to promulgate a rule under Revised Code Chapter 119 every time it establishes or changes a provider reimbursement rate.
 Assignment of Error 3:
 The Court below erred in granting a permanent injunction because the Bureau's reimbursement rate causes no irreparable harm to OHA, and there is an adequate remedy.
 {¶ 6} In its first assignment of error, the bureau argues that the trial court erred in granting declaratory and injunctive relief because, under the doctrine of laches, OHA has "sat" on its rights too long to assert them. Laches is an omission to assert a right for an unreasonable and unexplained length of time, under circumstances prejudicial to the adverse party. Baughman v. State Farm Mut. Auto. Ins. Co.,160 Ohio App.3d 642, 2005- Ohio-1948, at ¶ 10. To succeed utilizing the doctrine of laches, one must establish: (1) an *Page 4 
unreasonable delay or lapse of time in asserting a right; (2) the absence of an excuse for such delay; (3) knowledge, actual or constructive, of the injury or wrong; and (4) prejudice to the other party. State ex rel. Cater v. N. Olmsted (1994), 69 Ohio St.3d 315, 325. Accordingly, a delay in asserting a right does not of itself constitute laches. Smith v. Smith (1959), 168 Ohio St. 447, at paragraph three of the syllabus. Instead, the proponent must demonstrate that he or she has been materially prejudiced by the unreasonable and unexplained delay of the person asserting the claim. Connin v. Bailey (1984),15 Ohio St.3d 34, 35-36.
 {¶ 7} Here, the bureau maintains that appellees have known, at least since the HPP program was implemented in 1997, that the bureau makes changes to the reimbursement rates by means of the provider manual and bulletins without promulgating a rule under R.C. 119, and they waited too long to raise the issue in the current action. However, we find laches does not preclude the present action. Before the equitable doctrine of laches may apply, it must be pled as an affirmative defense pursuant to Civ.R. 8(C). Civ.R. 8(C) requires a party to assert affirmative defenses in the first responsive pleading or amendment thereof. Thus, "[i]n civil cases, laches is an affirmative defense that a defendant must raise in his answer, or it is deemed waived." State v.Barnes (Dec. 30, 1999), Clermont App. No. CA99-06-057, citing Civ.R. 8(C). See, also, Mossa v. W. Credit Union, Inc. (1992),84 Ohio App.3d 177, 180-181 (a failure to assert an affirmative defense by way of answer or amended answer waives that defense); Jazwa v. Alesci (Sept. 12, 1996), Cuyahoga App. No. 69857 (laches is an affirmative defense that must be asserted by way of answer or amended answer under Civ.R. 8[C] or it is deemed waived). In this case, appellees sought declaratory judgment and a permanent injunction *Page 5 
in their original complaint, and the bureau failed to assert the equitable doctrine of laches as an affirmative defense in its October 20, 2005 answer to these claims or in a later amendment. Therefore, the bureau waived the defense of laches. Further, although the bureau did eventually assert laches in its memorandum in opposition to the motion for permanent injunction, filed March 21, 2006, such was insufficient to raise the matter, given a request for permanent injunction was pled in the original complaint, and the bureau failed to raise laches in its responsive answer to that claim. Therefore, the bureau waived laches as a defense and cannot raise it on appeal. The bureau's first assignment of error is overruled.
 {¶ 8} The bureau argues in its second assignment of error that the trial court erred in granting declaratory judgment. Specifically, the bureau asserts it is not required to promulgate a rule under R.C. 119 every time it establishes or changes a provider reimbursement rate. In determining whether a party is entitled to declaratory relief, it must be demonstrated that: (1) a real controversy exists between the parties; (2) the controversy is justiciable in character; and (3) the situation requires speedy relief to preserve the rights of the parties. BurgerBrewing Co. v. Liquor Control Comm. (1973), 34 Ohio St.2d 93, 97; see, also, Buckeye Quality Care Centers, Inc. v. Fletcher (1988),48 Ohio App.3d 150, 154. In other words, it must be demonstrated that there is a controversy "`between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" Peltz v. South Euclid (1967), 11 Ohio St.2d 128,131, quoting Evers v. Dwyer (1958), 358 U.S. 202, 203, 79 S.Ct. 178. When the declaratory judgment action involves little or no disagreement with regard to the facts, the trial court's determination on questions of law are reviewed by this court de novo. *Page 6 
 Brown v. Scioto Cty. Bd. of Commrs. (1993), 87 Ohio App.3d 704, 711. A de novo analysis requires an independent review of the trial court's decision without any deference to the trial court's determination. Id.
 {¶ 9} At issue in the present matter is whether the bureau was required to promulgate a rule under R.C. 119 to establish or change the reimbursement rates for provider hospitals. R.C. 119.02 provides:
 Every agency authorized by law to adopt, amend, or rescind rules shall comply with the procedure prescribed in sections 119.01 to 119.13, inclusive, of the Revised Code, for the adoption, amendment, or rescission of rules. Unless otherwise specifically provided by law, the failure of any agency to comply with such procedure shall invalidate any rule or amendment adopted, or the rescission of any rule.
 {¶ lO} R.C. 4121.441 requires the bureau to adopt "rules" under R.C. 119 in undertaking certain actions pursuant to its administration of the HPP. Specifically, R.C. 4121.441(A)(8) provides, in pertinent part:
 (A) The administrator of workers' compensation, with the advice and consent of the workers' compensation oversight commission, shall adopt rules under Chapter 119. of the Revised Code for the health care partnership program administered by the bureau of workers' compensation to provide medical, surgical, nursing, drug, hospital, and rehabilitation services and supplies to an employee for an injury or occupational disease that is compensable under this chapter or Chapter 4123., 4127., or 4131. of the Revised Code.
 The rules shall include, but are not limited to, the following:
 * * *
 (8) Discounted pricing for all in-patient and out-patient medical services, all professional services, and all pharmaceutical services[.] *Page 7 
Therefore, pursuant to the above language, the bureau must adopt a "rule" for discounted pricing for all medical, professional, and pharmaceutical services.
{¶ ll} The bureau first asserts that absent from R.C. 4121.441(A)(8) is the requirement that actual reimbursement rates be delineated in detail in a rule. The bureau maintains that, in order to comply with R.C. 4121.441, it did, in fact, promulgate a rule, Ohio Adm. Code4123-6-08, which addressed discounted pricing. Ohio Adm. Code 4123- 6-08 provides, in pertinent part:
 (A) Pursuant to division (A)(8) of section 4121.441 of the Revised Code, the bureau shall develop, maintain, and publish a provider fee schedule for the various types of billing codes. The fee schedules shall be developed with provider and employer input.
 {¶ 12} The bureau claims Ohio Adm. Code 4123-6-08(A) satisfies the requirements of R.C. 4121.441(A)(8), and that it, in turn, complied with Ohio Adm. Code 4123-6-08(A) by developing, maintaining, and publishing the provider manual and bulletins pursuant to R.C. 4121.32(D), discussed infra. We disagree. R.C. 4121.441(A)(8) does not indicate that the bureau must promulgate a rule that merely addresses, in some ambiguous manner, discounted pricing. Rather, the plain language of R.C.4121.441(A)(8) is more direct and explicit. As written, R.C.4121.441(A)(8) indicates that "[t]he rules shall include * * * discounted pricing." Thus, the legislative command of R.C.4121.441(A)(8) is clear: the rule must include the discounted pricing itself, not merely a rule that sets forth the method or procedure under which the bureau will eventually develop, maintain, and publish the discounted pricing.
 {¶ 13} This distinction is appreciable when comparing R.C.4121.441(A)(8) to the other numbered subsections within that provision. Unlike several other subsections under *Page 8 
R.C. 4121.441(A), the directive under subsection (8) specifies directly what the rule itself must contain. For example, subsections (1) and (3) require only that rules establish "[p]rocedures" for certain matters; subsections (5) and (6) require that rules establish "methods" for certain activities; subsections (7) and (9) require that rules establish "provisions" for certain circumstances; and (11) and (12) require that rules establish "standards" and "criteria" for certain actions. Just as a rule promulgated pursuant to one of these subsections is required to include a procedure, method, provision, or standard, the rule promulgated, pursuant to subsection (8), must include discounted pricing. However, Ohio Adm. Code 4123-6-08(A) does not actually include discounted pricing; rather, Ohio Adm. Code 4123-6-08(A) provides only that the bureau must develop, maintain, and publish the discounted pricing, something which R.C. 4121.441(A)(8) already requires. This is not a hyper-technical reading of subsection (8) but a plain reading of the language utilized by the drafters of the statute. The language used in subsection (8) is more akin to that in subsection (10), which indicates that "[t]he rules shall include * * * [a]ntifraud mechanisms." This language requires the bureau to promulgate rules that include antifraud mechanisms themselves and not merely rules that generally require the eventual development of antifraud mechanisms. To find that the bureau was merely required to promulgate a rule that detailed the "procedures" or "methods" for developing and publishing discounted pricing, and not a rule with the actual discounted pricing, would be to supply words not included in R.C. 4121.441(A)(8), which this court is forbidden to do. See East Ohio Gas Co. v. Limbach (1991),61 Ohio St.3d 363, 365 (a court in interpreting a statute must give effect to the words utilized, cannot *Page 9 
ignore words of the statute, and cannot supply words not included). Therefore, we find Ohio Adm. Code 4123-6-08(A) does not satisfy the requirements of R.C. 4121.441(A)(8).
 {¶ 14} The bureau cites R.C. 4121.32(D) as further support of its contention that R.C. 4121.441(A)(8) does not require promulgation of a rule under R.C. 119 to set new reimbursement rates. R.C. 4121.32(D) provides, in pertinent part:
 The bureau shall establish, adopt, and implement policy guidelines and bases for decisions involving reimbursement issues including, but not limited to, the adjustment of invoices, the reduction of payments for future services when an internal audit concludes that a health care provider was overpaid or improperly paid for past services, reimbursement fees, or other adjustments to payments. These policy guidelines and bases for decisions, and any changes to the guidelines and bases, shall be set forth in a reimbursement manual and provider bulletins.
 Neither the policy guidelines nor the bases set forth in the reimbursement manual or provider bulletins referred to in this division is a rule as defined in section 119.01 of the Revised Code.
 {¶ 15} The bureau asserts that the first paragraph of R.C. 4121.32(D) requires it to publish a provider manual and bulletins that set forth the policy guidelines and bases for decisions involving reimbursement fees, and it complied with such requirement by publishing the reimbursement rates in the provider manual and bulletins. However, in order for the bureau's theory to be correct, the reimbursement rates must constitute "policy guidelines and bases for decisions involving reimbursement issues[.]" The Ohio Revised Code does not define either "policy guidelines" or "bases for decisions," but helpful to this analysis are two definitions found in R.C. 119.01. R.C. 119.01(C) defines a "rule" as: *Page 10 
 * * * [A]ny rule, regulation, or standard, having a general and uniform operation, adopted, promulgated, and enforced by any agency under the authority of the laws governing such agency, and includes any appendix to a rule. "Rule" does not include any internal management rule of an agency unless the internal management rule affects private rights * * *
R.C. 119.01(D) defines "adjudication" as "the determination by the highest or ultimate authority of an agency of the rights, duties, privileges, benefits, or legal relationships of a specified person[.]"
 {¶ 16} Although there exists a dearth of Ohio case law on the specific issue at bar, it is universal that "[a]n agency has discretion to choose between rulemaking, adjudication, or an informal disposition in discharging its statutory duty[.]" Northwest Covenant Med. Ctr. v.Fishman (2001), 167 N.J. 123, 137. With regard to "policy guidelines," it has been held that "[t]he distinction between `general statements of policy' and `rules' is critical." Center for Auto Safety v. NationalHighway Traffic Safety Admin. (D.C. Cir. June 23, 2006), 452 F.3d 798,807 (analyzing certain "policy guidelines" of the National Highway Traffic Safety Administration in administering the National Highway Traffic Safety Administration Authorization Act of 1991). "[P]olicy guidelines do not establish any binding rules," id., at 800, but are merely "general policy statements with no legal force." Id., at 808. In the present case, the bureau intended the reimbursement rates to be binding on hospitals, with the force and effect of a legal rule, not mere guidelines or general statements of policy. Therefore, the reimbursement rates do not fit within the meaning of "policy guidelines" for purposes of R.C. 4121.32(D).
 {¶ 17} Further, the reimbursement rates were not adopted to serve merely as "bases for decisions involving reimbursement issues." Rather, the bureau intended the *Page 11 
reimbursement rates to have widespread application and to be applied uniformly to all similarly situated persons, two hallmarks of an agency determination that should be addressed by rule-making. SeeMetromedia v. Director, Div. of Taxation (1984), 97 N.J. 313, 331-332
(formulating standards to distinguish rule-making from adjudication). It is clear the reimbursement rates were not intended to be standards applied on a case-by-case basis and to individual proceedings. Instead, the bureau intended the reimbursement fees to apply to all hospitals prospectively and to have a continuing effect, which are also indicators of an agency action that must be accomplished pursuant to rule-making. See In re Protest of Coastal Permit Program Rules (2002),354 N.J.Super. 293, 362; and Metromedia, at 331-332. Therefore, we find the reimbursement rates did not constitute "bases for decisions" involving reimbursement fees for purposes of R.C. 4121.32(D). Accordingly, because the reimbursement rates were neither "policy guidelines" nor "bases for decisions," the first paragraph in R.C. 4121.32(D) does not grant the bureau authority to implement new reimbursement rates by publishing them in its provider manual and bulletins. Further, given the above findings, the second paragraph in R.C. 4121.32(D) also fails to exempt the reimbursement rates from the definition of a "rule" under R.C. 119.
 {¶ 18} We also note the bureau contends that, in passing R.C. 4131.32(D), the legislature intended to nullify this court's holding inOhio State Chiropractic Assoc. v. Ohio Bur. of Workers' Comp. (Jan. 21, 1993), Franklin App. No. 92AP-874, and, thus, exempt the bureau from the necessity of promulgating a rule for each new provider reimbursement rate. We disagree. In Ohio State Chiropractic, the appellees filed an action against the bureau seeking an injunction against the enforcement of Chapter 13 of *Page 12 
the bureau's provider billing and reimbursement manual, which was promulgated through provider bulletins, and seeking a declaratory judgment that Chapter 13 was invalid because the bureau had not complied with the rule-making requirements of R.C. 119 in promulgating it. Chapter 13 contained information about the standards and eligibility requirements for the payment of physical medicine fee bills. The bureau claimed that Chapter 13 was not a set of rules, but, rather, a set of guidelines that it could adopt without the R.C. 119 procedure, pursuant to a prior version of R.C. 4121.32 that did not include current subsection (D). The trial court in Ohio State Chiropractic granted summary judgment to the appellees, finding that Chapter 13 contained rules and was subject to the rule-making requirements in R.C. 119.
 {¶ 19} On appeal, this court affirmed the trial court. We found that, although former R.C. 4121.32(A), (B), and (C) provided an exemption for rule-making by allowing the supplementation of rules via operating manuals, the exemption found in subsections (A), (B), and (C) referred specifically to "employees" and "operating procedures." We stated that the guidelines discussed in these provisions related only to employees and were designed to help the employees perform their functions and direct them regarding operating procedures and decision making. Thus, any manuals and guidelines adopted, pursuant to R.C. 4121.32, were not subject to the rule-making requirements of R.C. 119.01(C), which specifically excludes from the definition of "rules" internal management regulations for employees that do not affect private rights. However, this court concluded that Chapter 13 in Ohio State Chiropractic was a "rule" that did not fall within the rule-making exemption in R.C.4121.32 because it concerned eligibility for payment and reasonable medical charges that affected the private rights of third parties and was not *Page 13 
related to internal management to assist employees in performing their functions. We also noted R.C. 4121.32 contained no language specifically excluding the agency from compliance with R.C. 119 in adopting "rules," as defined by R.C. 119.01(C).
 {¶ 20} In the present case, the bureau claims that, in response toOhio State Chiropractic, the legislature amended R.C. 4121.32 in 1995, by adding subsection (D), which did not include any reference to "operating procedures" and the behavior of "employees," and also amended R.C. 119.01(A)(1), which now indicates "Sections 119.01 to 119.13 of the Revised Code do not apply to actions of the industrial commission or the bureau of workers' compensation * * * under division (D) of section 4121.32[.]" However, we find the bureau's arguments unavailing. Even if R.C. 4121.32(D) and the amendments to R.C. 119.01(A)(1) "nullified" the holding in Ohio State Chiropractic and would now render Chapter 13 in that case not subject to the rule-making procedures in R.C. 119, the facts in Ohio State Chiropractic are different from those in the present case. The court described Chapter 13 in Ohio State Chiropractic as "a set of regulations concerning bases for decision making regarding reasonable medical charges and eligibility requirements for payment[,]" and such may well fall under the exemption as defined in R.C.4121.32(D), and, consequently, the exemption in R.C. 119.01(A)(1). In contrast, the reimbursement rates at issue in the present case, as we have already found, do not concern "bases for decision making" under R.C. 4121.32(D). Thus, the reimbursement rates still fail to fit within the purview of subsection (D), and the exemption in R.C. 119.01(A)(1) would be inapplicable.
 {¶ 21} In addition, the bureau can point to no authority indicating that either R.C. 4121.32(D) or Ohio State Chiropractic invalidate the legislative mandate in R.C. *Page 14 4121.441(A)(8). If the legislature had intended R.C. 4121.32(D) to annul or amend the effect of R.C. 4121.441(A)(8), it would have likely mentioned the latter in the subsequent passage of the former. The lack of any indication to overrule Ohio State Chiropractic or the requirements of R.C. 4121.441(A)(8) is telling.
 {¶ 22} We also find the bureau's reliance upon our decision inHenley Health Care v. Ohio Bur. of Workers' Comp. (June 29, 1999), Franklin App. No. 98AP-922, does not advance their argument. Initially, we note that, although the bureau asserts we upheld the finding of the Ohio Court of Claims that "the decision in Ohio State Chiropractic had been nullified by the Ohio General Assembly, through its amendment of R.C. 4121.32(D)[,]" Henley Health Care, supra, this court never explicitly did so. Although we did reiterate the holding of the Court of Claims in this respect, we ultimately determined any application of the 1995 statute was "prospective only and cannot be applied to support appellees' recoupment during 1994." Id. Because this court never directly reached the merits of or analyzed whether R.C. 4121.32(D) had the effect of nullifying Ohio State Chiropractic, the application of that case to the present case, in the manner insisted by the bureau, would be tenuous. Regardless, even if it were true that Ohio StateChiropractic had been nullified by R.C. 4121.32(D), Ohio StateChiropractic was issued the same year R.C. 4121.441 was passed; therefore, that case did not address R.C. 4121.441. Further, this court did not address the applicability of R.C. 4121.441(A)(8) inHenley, which demonstrates the decision lacked a full review of the issue and undercuts the persuasive value of the case. Therefore, we findHenley unpersuasive for purposes of the bureau's argument. *Page 15 
 {¶ 23} The bureau also makes several public policy arguments. The bureau asserts it was reasonable for the legislature to allow the bureau to set and adjust reimbursement rates for the 50 provider categories and over 13,000 reimbursement codes outside of the lengthy R.C. 119 rule promulgation process. The bureau claims that the process to promulgate a rule under R.C. 119 is extensive, including several hearings, opportunities for constituent input, and additional review by the Workers' Compensation Oversight Commission. However, we agree with the trial court that such public policy issues are immaterial to our analysis. While it may be true that it would be reasonable to allow the bureau to set reimbursement rates without having to promulgate rules under R.C. 119, until the legislature permits such activities through statutory sanction, this court is without authority to allow it. Therefore, for all the foregoing reasons, we conclude the bureau was required to promulgate a rule under R.C. 119 to establish or change the reimbursement rates for hospitals, and the trial court did not err in granting declaratory judgment in favor of appellees. The bureau's second assignment of error is overruled.
 {¶ 24} The bureau argues in its third assignment of error that the trial court erred in granting a permanent injunction. Whether to grant or deny an injunction is a matter solely within the discretion of the trial court, and a reviewing court will not disturb the judgment of the trial court in the absence of a clear abuse of discretion. Garono v.State (1988), 37 Ohio St.3d 171, 173. A permanent injunction is an equitable remedy that will be granted only where the act sought to be enjoined will cause immediate and irreparable injury to the complaining party and there is no adequate remedy at law. Lemley v. Stevenson
(1995), 104 Ohio App.3d 126, 136; Strah v. Lake Cty. Humane Soc. (1993),90 Ohio App.3d 822, 831. "The purpose of an injunction is to prevent a future injury, not to redress *Page 16 
past wrongs." Lemley, at 136. An essential element of injunctive relief involves a balancing process designed to weigh the equities between the parties. Rite Aid of Ohio, Inc. v. Marc's Variety Store, Inc. (1994),93 Ohio App.3d 407, 418. In an action for permanent injunction, the plaintiff must prove his or her case by clear and convincing evidence.Procter Gamble Co. v. Stoneham (2000), 140 Ohio App.3d 260, 267-268. "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. Cross v.Ledford (1954), 161 Ohio St. 469, 477. It is more than a mere preponderance, but does not require such certainty as beyond a reasonable doubt. Id. It does not mean clear and unequivocal. Id. The issuance of an injunction is a matter of judicial discretion, and, absent an abuse of discretion by the trial court, an appellate court is not permitted to question the trial court's decision to deny or grant such relief. Control Data Corp. v. Controlling Board (1983),16 Ohio App.3d 30, 35.
 {¶ 25} Here, the bureau asserts that it should be permitted to enforce the plan because appellees have failed to demonstrate irreparable harm will result if the plan continues, and there is an adequate remedy at law. "Irreparable harm" is an injury for which there is no plain, adequate, and complete remedy at law, and for which monetary damages would be impossible, difficult or incomplete. Cleveland v. ClevelandElec. Illum. Co. (1996), 115 Ohio App.3d 1, 12. In the context of injunctive relief, "adequate remedy at law" has been defined to mean that "the legal remedy must be as efficient as the indicated equitable remedy would be; that such legal remedy must be presently available in a single action; and that such remedy must be certain and complete."Mid-America *Page 17 
 Tire, Inc. v. PTZ Trading Ltd., 95 Ohio St.3d 367, 2002-Ohio-2427, at ¶ 81, citing Fuchs v. United Motor Stage Co., Inc. (1939),135 Ohio St. 509.
 {¶ 26} We first note that, if the bureau had agreed to cease enforcement of the invalid plan, injunctive relief would not have been necessary. However, it is evident from the record and the trial court's comments that the bureau continues to enforce the new plan and apparently intends to continue such enforcement in the future, despite the trial court's opinion that the new reimbursement fees were invalidly promulgated. The trial court noted that the bureau's continued enforcement of the plan in the face of its determination that the plan was invalid would render its decision meaningless. Having noted such, the trial court found it necessary to issue an injunction to stop the bureau from continuing enforcement of the invalid plan. Therefore, as a result of the foregoing, we must address the merits of injunctive relief.
 {¶ 27} The bureau first claims no irreparable harm will result because the alleged harm caused by its continued enforcement of the plan is only monetary, and appellees have an adequate remedy at law by way of an action for equitable restitution. Initially, we note both "irreparable harm" and "adequate remedy at law" require that a "legal" remedy exist. However, by definition, equitable relief is not a legal remedy. "The reimbursement of monies withheld pursuant to an invalid administrative rule is equitable relief, not money damages." Ohio Hosp. Assn. v. OhioDept. of Human Services (1991), 62 Ohio St.3d 97, paragraph three of the syllabus. Thus, despite the bureau's claim that appellees would be able to seek monetary damages via equitable restitution if the bureau were to be permitted to continue to enforce the new plan, appellees would actually be seeking the reimbursement of monies withheld, pursuant to the invalidly promulgated administrative *Page 18 
rule, which constitutes equitable relief, not monetary damages. Accordingly, appellees' remedy would be equitable, and not one "at law." On this basis alone, the harm suffered by appellees would be irreparable, and they would have no adequate remedy at law, as those terms have been defined.
 {¶ 28} Notwithstanding, the bureau's argument fails on other grounds as well. Initially, appellees clearly will suffer a "harm" if the bureau is not enjoined from enforcing the rule. Evidence presented in the trial court indicated the plan would result in Genesis and other provider hospitals losing millions of dollars per year by cutting the reimbursement rates. The bureau admits that the plan would reduce the profit of the hospitals, although it minimizes such fact by claiming that a hospital will lose, "at worst," only "some" profit; that reducing the profit "hardly rises" to the level of irreparable harm; that the new plan was "carefully crafted" and is fair; that no hospital will face "financial ruin" as a result of the new reimbursement rates; and that, "at worst," a hospital's profit margin will only be "narrowed." The bureau also minimizes the effect of the plan by insisting "the new formula ensures that hospitals continue to make a profit," and it "continues to pay hospitals at a rate higher than either Medicare or Medicaid." We reject the bureau's efforts to cast the effect of the rule upon appellees' profits as something less than "harm." The bureau's perspective on the monetary effects of the new plan are acutely understated. Lost profits by a corporation must clearly constitute injury, regardless of degree. Therefore, we find appellees would suffer harm by implementation of the new plan.
 {¶ 29} Further, such harm will be "irreparable." The bureau contends the lost profits are not irreparable because appellees can seek monetary damages. By definition, *Page 19 
to be "irreparable," the injury must be one that is incapable of being remedied, or would be incompletely remedied, by monetary damages. SeeCleveland Elec. Illum. Co., supra, at 12. However, appellees' remedy would not lie in "money damages." Rather, what appellees could actually seek for the bureau's continued enforcement of the invalidly promulgated rule would be specific performance. When a party seeks funds to which a statute allegedly entitles it, rather than money in compensation for the losses that the party will suffer or has suffered by virtue of the withholding of those funds, the nature of the relief sought is specific relief, not relief in the form of monetary damages. See Maryland Dept.of Human Resources v. Dept. of Health Human Services (1985),763 F.2d 1441, 1446. Thus, appellees' injury is not capable of being remedied by monetary damages, but, rather, specific performance, thereby rendering the harm irreparable. Accordingly, we find appellees will suffer irreparable harm without injunctive relief.
 {¶ 30} The bureau also contends that it should be permitted to continue to enforce the new plan because there exists an adequate remedy at law. Presumably, the bureau maintains the member hospitals could institute legal actions against the bureau to collect the difference between the reimbursement under the old rates and the amount received under the new rates. However, an "adequate remedy at law" requires a legal remedy that is available in a single action. Here, if the bureau were permitted to continue to enforce the new reimbursement fees, member hospitals would have a new legal cause of action against the bureau every time they treat a patient under the plan. Such would result in multiple actions. Even if the member hospitals did not file a cause of action after every new patient treated under the new plan, but filed actions only periodically to recoup the lost fees, there would still exist the necessity for multiple actions. Additionally, although *Page 20 
the bureau claims that the member hospitals would be able to recover monies through a class action suit comprised of all member hospitals, if the bureau continues to enforce the plan, a single class action lawsuit would be insufficient to prevent ongoing and future damages.
 {¶ 31} The bureau counters that Genesis and other member hospitals are free to eliminate the future nature of the harm by cancelling their HPP contracts. The bureau points out that the provider contract between the hospitals and the bureau is voluntary and allows the hospitals to terminate the contract at any time with a 45-day notice. It is well-established that the purpose of an injunction is to prevent future harm. Lemley, at 136. In the present case, notwithstanding the bureau's legally peculiar stance that it should be permitted to continue to enforce rules invalidly promulgated, the bureau's assertion is that the provider hospitals knowingly contracted for the harm they complain of in this case. We disagree for several reasons. It is true, as the bureau points out, that the provider agreement indicates that each hospital agreed to accept and abide by billing policies, procedures, and criteria set forth and amended from time to time in the provider billing and reimbursement manuals and/or provider bulletins. However, in the same paragraph that sets forth this requirement, the agreement indicates that "[n]othing herein shall be considered a waiver of [the provider hospitals'] rights pursuant to Chapter 119 of [the] Ohio Revised Code." Therefore, despite the language relied upon by the bureau, the agreement also reserves the rights of the hospitals to assert non-compliance with R.C. 119, which is precisely what appellees did in the present case. Thus, the contractual provision relied upon by the bureau does not prohibit injunctive relief. In addition, termination of the provider contract by the member hospitals is not an adequate remedy *Page 21 
at law. "Adequate remedy at law" contemplates a legal remedy undertaken through the judicial process. Requiring the member hospitals to cancel the contract in order to avoid the effects of the invalidly promulgated fee provisions would not constitute an adequate remedy at law. Therefore, we find this argument without merit.
 {¶ 32} For these reasons, we find the trial court did not abuse its discretion in finding appellees are entitled to a permanent injunction. Because we have found appellees will suffer irreparable harm and be without an adequate remedy at law, we need not address appellees' contention that they are automatically entitled to an injunction because continued enforcement of the plan constitutes a governmental agency acting beyond the scope of its authority. Therefore, the bureau's third assignment of error is overruled.
 {¶ 33} Accordingly, the bureau's three assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
 PETREE and KLATT, JJ., concur. *Page 1