**UNIVERSITY HILLS, INC., Plaintiff-Appellee,**

v.

**Robert H. PATTON, Bert Maxwell, Jr. and Layton A. Humphrey, Defendants-Appellants.**

No. 19964.

United States Court of Appeals, Sixth Circuit.

June 15, 1970.

Thomas L. Dalrymple, Toledo, Ohio, James Hodge, Jr., Walter E. Apple, Toledo, Ohio, on the brief; Fuller, Seney, Henry & Hodge, Toledo, Ohio, of counsel, for appellants.

Robert B. Gosline, Toledo, Ohio, Shumaker, Loop & Kendrick, Toledo, Ohio, on the brief, for appellee.

Before WEICK and CELEBREZZE, Circuit Judges, and McALLISTER, Senior Circuit Judge.

WEICK, Circuit Judge.

Plaintiff-Appellee, University Hills, Inc. (University Hills), is an Ohio corporation with its principal office and place of business in Toledo. Defend-ants-appellants, Robert H. Patton, Bert Maxwell, Jr. and Layton A. Humphrey, all residents of Texas, are engaged in the business of constructing college dormitories.

University Hills instituted the present action in the Common Pleas Court of Lucas County, Ohio, to enjoin appellants from constructing dormitories on premises adjacent to and in front of their land, in Toledo, Ohio. The gist of the action was that dormitory construction would violate restrictions on the use of the land. The action was removed to the District Court on the ground of diversity of citizenship.

After a full hearing, the District Court entered a decree permanently enjoining appellants from constructing dormitories or any other structure except as described in a Site Plan (discussed below) developed by University Hills. We reverse.

Prior to January 27, 1965, Wright Brothers Greenhouse Company (Wright Brothers) was owner of the fee simple title to a 26-acre tract of land located directly across the street from Toledo University. The 26 acres were divided into three lots. Lots numbers 1 and 2 fronted on Bancroft Street and faced the campus of Toledo University. Lot number 3 was approximately the size of lots 1 and 2 combined, and was situated directly in the rear of lots 1 and 2.

On January 27, 1965, Wright Brothers entered into a purchase agreement with Sidney Bloom, former vice-president of University Hills, to sell to him the entire 26 acres. The agreement contained the following covenant:

"3. Purchaser [Sidney Bloom] agrees to immediately proceed with all due diligence, at his expense, to obtain by the Plan Commission or other proper city authorities approval for the legal use of said parcel of real estate under the Community Unit Plan Zoning Classification[1] and to

1. The Toledo Municipal Code, Art. XX § 9–20–3 permits a private owner of a tract of five acres or more to obtain a

special use classification to develop the tract according to an approved plan, or Community Unit Plan. Once this clas-

vigorously pursue said approval and to do any and all things necessary and incident thereto to obtain said approval." (Footnote added)

In the event that Bloom was unable to obtain the necessary zoning change, Wright Brothers by said contract was given the option of lowering the purchase price or giving Bloom additional time. Bloom, however, was not to be relieved from his obligation to purchase.

The Community Unit Plan for which Bloom intended to obtain approval was shown on a map known as the Site Plan (but referred to as "Exhibit A" in all of the documents). The Site Plan divided the 26 acres into three areas corresponding to the three lots of the parcel, and showed the proposed location of access ways and various other utilities. Of more importance to the instant case, it showed in detail the placement of apartment buildings on lot 3, and the placement of a small shopping center area on lots 1 and 2, to service the proposed apartments.

The contract with Wright Brothers provided that Bloom may assign his rights thereunder to University Hills.

During 1965, appellants' grantor, Richard Anteau, the proprietor of a supermarket in Toledo, became interested in the development proposed in the Site Plan. On January 4, 1966, Anteau entered into an agreement with University Hills to purchase "Area No. 1 on Exhibit 'A' * * *."[2] The contract contained several conditions, among which were the following:

"B. Toledo City Council has by ordinance rezoned the subject premises to C–4.[3]

"C. The Toledo Plan Commission has approved placement of buildings as presently indicated on Exhibit 'A'." (Footnote added)

On the same day, Anteau procured an option from University Hills to purchase "Area No. 2 on Exhibit 'A' * * *." The $25,000-consideration for the option was refundable to Anteau if, for any reason other than his own default, the purchase of area 1 was not closed. As of the date of these agreements, the purchase agreement between Wright Brothers and Sidney Bloom was in effect. University Hills did not then own the legal title to any of the three areas.

The Site Plan had been submitted to the Toledo City Council as a part of of the application for a change in the zoning ordinance which would make the development legally possible. On February 11, 1966, the Toledo Plan Commission made a formal recommendation to the Toledo City Council that it grant the necessary zoning ordinances to permit development according to the Site Plan. The City Council subsequently followed that recommendation by enacting Ordinances Nos. 114–66 and 115–66, which incorporated by reference the Site Plan.

sification is obtained, building permits will "be issued even though the use of land and the location and height of buildings * * * and the yards and open spaces contemplated by the plan do not conform in all respects to the regulations of the district in which it is located."

2. On direct examination, Mr. Anteau's attorney testified to the reason for describing the areas in terms of the Site Plan rather than in conventional legal terms which make reference to characteristics of the surrounding area relevant for surveying purposes. He stated:

"Well, the purpose of the agreement was to outline the area which was to be purchased. There was no survey available. This was done in a rush; time was of the essence. My first entry in this was December 30th, and the agreements were concluded on January 4th. So that the purpose of using this was to delineate the area to be purchased by Mr. Anteau."

3. Toledo Municipal Code, Art. XI, provides:

"C–4 Shopping Center District

"Section 9–11–1. Plan Required

"The C–4 Shopping Center District shall be laid out and developed as a unit according to an approved plan, * * * in order to provide for modern retail shopping facilities of integrated design in appropriate locations to serve residential neighborhoods." (Emphasis added.)

On February 16, Anteau informed University Hills of his intention to exercise his option on area 2, and requested information for the closing of the purchase of area 1. As of that date University Hills still had no interest of record in any of the lots.

On April 26, 1966, Wright Brothers executed a warranty deed to Richard Anteau, conveying the title to area 1 and 2. In the conveyance, however, the premises were not described in terms of the areas contained on the Site Plan, but were given a conventional legal description. The warranty in the deed was made subject to the following exceptions:

"Subject also to an easement granted to The Toledo Edison Company by instrument dated October 21, 1925, and recorded in Volume 678 of Deeds, Page 13, for the installation and maintenance of electrical energy transmission line over the property described therein, and subject also to a pipeline right-of-way granted to The Standard Oil Company by instrument dated June 4, 1951, and recorded in Volume 1427 of Mortgages, Page 234, with rights of ingress and egress over the property described therein, together with all the privileges and appurtenances thereunto belonging, but subject to zoning ordinances, restrictions of record and public utility or other easements of record and taxes and assessments due and payable after March 31, 1966."

No covenants restricting the use of the land were contained in the deed.

On the same day, a warranty deed containing a similar exception was executed by Wright Brothers conveying area 3 (described in a legal description) to University Hills.

On May 4, Sidney Bloom executed an instrument assigning to University Hills his right to receive a deed to area 3 and assigning to Anteau his right to receive a deed to areas 1 and 2 under the purchase agreement between Bloom and Wright Brothers. The assignment was consented to by Wright Brothers.

On July 18, 1967, appellants obtained from University Hills an option to purchase area 3 for $735,000. The consideration for the option was $25,000, which was not to be applied to the purchase price in the event the option was exercised. The conveyance, if the option was exercised, was to be by warranty deed with the following exceptions:

"3. *Deed.* At the closing, the Premises will be conveyed to The Title Guarantee and Trust Company, Trustee, by a warranty deed, hereinafter called the 'Deed,' warranting the title to the Premises to be free and clear of all material defects and encumbrances other than:

(i) The lien of taxes not yet payable;

(ii) An easement granted to The Toledo Edison Company, recorded in Volume 678 of the Records of Deeds of Lucas County, Ohio, at page 13;

(iii) A pipeline right of way granted to The Standard Oil Company of Ohio, recorded in Volume 1427 of the Record of Deeds of Lucas County, Ohio, at page 234;

(iv) Any legal highways; and

(v) Any zoning ordinances of the City of Toledo, including Ordinance No. 115–66, enacted February 21, 1966, as amended by Ordinance No. 67–67, enacted January 30, 1967."

No mention was made of plans for developing the land in accordance with the Site Plan, nor were there mentioned any contracts between University Hills and Richard Anteau[4]. The option, although extended twice, was never exercised. The total consideration paid by appellants for the option and extensions was $51,001.

---

4. The District Court found as a matter of fact that appellants had knowledge of the contracts between Anteau and University Hills and of the Site Plan. Finding of Fact. No. 12, *infra*.

On November 24, 1967, a meeting was held between appellants, Richard Anteau and representatives of University Hills. At that time appellants extended their option on area 3 with University Hills and procured an option (to purchase) from Anteau on areas 1 and 2. The option from Anteau specifically mentioned the existence of appellants' option on area 3, and also contained language indicating an intent on the part of appellants to follow a plan different from the Site Plan. One of the duties undertaken by appellants was:

"H. Purchasers [appellants] shall prepare and deliver copies to Anteau of proposed amendments to the site plans attached to Ordinance No. 114–66 and Ordinance No. 115–66."

Corresponding to this, the option contained the following language:

"4. As soon as possible after the recording of the Plats, Anteau will file with the Clerk of Council of the City of Toledo the amendment to be prepared by Purchasers to the site plans attached to Ordinance No. 114–66; the Purchasers will cause to be filed by Title Guarantee with the Clerk of Council if the City of Toledo the amendment to be prepared by Purchasers to the site plan attached to Ordinance No. 115–66. Both Anteau and Purchasers will thereafter urge upon the City Planning Commission the approval of said site plans and, upon such approval by the City Planning Commission, urge upon the Council of the City of Toledo the enactment of all ordinances necessary to permit the construction of buildings on the properties * * * in accordance with the site plans prepared by Purchasers.

Respecting title, the option provided:

"Title to such properties shall be good, marketable, free and unencumbered except for the lien of taxes not yet due and payable, an easement granted to The Toledo Edison Company recorded in Volume 678 of Deeds, page 13, a pipe line right of way granted to The Standard Oil Company recorded in Volume 1427 of Deeds, page 234, and easements as noted on the recorded Plat I, University Hills; taxes and assessments shall be prorated to the date of closing in accordance with the present custom of the Toledo Real Estate Board; * * *."

On March 1, 1968, appellants exercised the option on areas 1 and 2 owned by Anteau. However, as before stated, they never exercised their option on area 3.

On May 5, University Hills instituted the present action in the state court to enjoin appellants from constructing dormitories or any other structures except in accordance with the Site Plan.

On June 6, the City Council passed an ordinance changing the zoning of areas 1 and 2 from C–4 to R–4A. The C–4 classification permitted construction only in accordance with the Site Plan. The R–4A permitted construction of dormitories only.

In granting the injunction, the District Court made the following findings of fact:

"9. By the January [purchase agreement for area 1] and February [option for area 2] contracts, both of which were based on and included the Site Plan in its entirety, University Hills, Inc. and Richard B. Anteau, co-developers of the 26 acres of land, agreed to and did restrict the use of this land in accordance with the general plan for development established by the Site Plan. This included agreement that apartment buildings were to be constructed on the rear portion designated Lot No. 3, that commercial buildings were to be constructed on the front portion being Lots No. 1 and No. 2, and that the provisions for roadways, streets, parking lots, drainage, etc. as indicated and prescribed in the Site Plan were to be followed for the purpose of making a perfected subdivision designed to accommodate a large number of apartment dwellers with an adjacent

shopping center. These Site Plan restrictions were in effect both as zoning ordinances and contractual restrictions.

 \* \* \* \* \* \*

"12. The defendants knew and should have known of the entire scheme and general plan of development of this 26-acre tract. They had knowledge of the use restrictions on this property both as zoning, and as a part of contracts of which they took a blanket assignment. \* \* \* Patton's intimate knowledge and defendants' extensive contractual arrangements with both developers, placed them under a duty to inquire with respect to all such contracts including the January and February (1966) contracts which created the contractual restrictions under consideration.

"13. On April 12, 1968, defendants took title to Lots 1 and 2 with knowledge of and therefore subject to the contractual use restrictions of the January and February (1966) contracts between Richard B. Anteau and University Hills, Inc."

We are of the opinion that the District Court erred in interpreting these written agreements as containing contractual use restrictions binding on appellants.

Although findings of fact adopted by a District Court are binding on an appellate court unless clearly erroneous, Fed.R.Civ.P. 52(a), the interpretation of written contracts, conclusions of law, mixed questions of fact and law, and findings as to an ultimate fact, adopted by the court, are not subject to the rule and are within the competence of an appellate court. Cordovan Associates, Inc. v. Dayton Rubber Co., 290 F.2d 858, 859–860 (6th Cir. 1961); *cf.* Union Planters Nat'l Bank v. United States, 115 F.2d 426 (6th Cir. 1970).

We are bound by Ohio law, and in interpreting these contracts we must keep in mind the policies of the state of Ohio.

In Ohio, as in most states, there is a policy favoring the free and unrestricted use of land. E. g., Bove v. Giebel, 169 Ohio St. 325, 329, 159 N.E. 2d 425 (1959). As a result of this policy the rule has developed that agreements purporting to restrict the free use of land are to be "strictly construed against limitations upon such use, and that all doubts should be resolved against a possible construction thereof which would increase the restriction upon the use of such real estate." Loblaw v. Warren Plaza, Inc., 163 Ohio St. 581, 592, 127 N.E.2d 754, 760 (1955); Carranor Woods Property Owners' Ass'n v. Driscoll, 106 Ohio App. 95, 101, 153 N.E.2d 681 (1957). See Kiley v. Hall, 96 Ohio St. 374, 117 N.E. 359 (1917) (covenant forbidding construction of dwelling closer than 24 feet from street does not prevent construction of a business building within 24 feet).

The District Court was in error in holding that zoning ordinances in effect on the date of the conveyance by Anteau to appellants, were binding as restrictions on the use of the land, either because they were specifically referred to in the deed or because they constituted restrictions of record, also referred to in the deed.

The District Court found that appellants were bound by the zoning ordinances because their deed from Anteau "recited that the grant was subject to the zoning ordinances \* \* \*." However, the warranty deed conveyed marketable title "subject \* \* \* to: \* \* \* (6) zoning ordinances \* \* \*." To construe this clause as restricting the use of the property in accordance with the zoning ordinances in effect on the date of conveyance is to give to it a very broad reading.

In Ohio, breach of the covenants of a warranty deed subject the grantor to damages. *E. g.*, Patterson's Lessee v. Pease, 5 Ohio 190, 191–192 (1831).

Reference to the existence of the zoning ordinances was included in a section

of the contract which excepted from operation of the warranty certain encumbrances which otherwise would have constituted a breach of warranty. Specifically excepted from operation of the warranty were certain private easements and taxes which were to become due, both of which would have constituted a breach of warranty. 15 Ohio Juris., Covenants §§ 55 and 60. Although zoning ordinances may not constitute a breach of the warranty, cautious practice no doubt dictated their inclusion with the other exceptions. The clear meaning of the provision is to show that the purchasers were aware of the existence of zoning ordinances and that the warranty was not breached by their existence.

 Nor are the zoning ordinances "restrictions of record" as the District Court found. The restrictions of record are those required to be recorded in order to serve as notice to bona fide purchasers. See Ohio Rev. Code § 5301.25 (Page's 1954).

University Hills relies on the District Court's finding that the Site Plan constituted a general scheme or plan which was a contractual agreement between Anteau and University Hills contained in both the option to purchase area 2 and the purchase agreement for area 1. The District Court found that appellants were bound because they knew or should have known of the existence of the general plan and because they were assignees of Anteau's rights under the contracts with University Hills.

 The District Court was correct in holding that contractual use restrictions on land which establish the existence of a general plan are enforceable under Ohio law. However, cases involving general schemes or plans must be considered in light of their fact situations.

In Berger v. VanSweringen Co., 6 Ohio St.2d 100, 216 N.E.2d 54 (1966), in which the court held that a beneficiary of restrictive covenants, made pursuant to a general plan, had standing to enforce them, the general plan was formulated by a single grantor who put the restrictive covenants in the conveying instruments. Similarly, in all of the cases which our research of Ohio law has revealed, two elements are present: A common grantor subdivides the property and the restrictive covenants are contained in explicit language in the deeds or on a recorded plat. E. g., Dixon v. VanSweringen Co., 121 Ohio St. 56, 166 N.E. 887 (1929); Carranor Woods Property Owners' Ass'n v. Driscoll, *supra.*

In the instant case the common grantor was Wright Brothers. Neither the deed to Anteau nor the deed to University Hills contains any restrictions on the use of the 26-acre tract in accordance with the Site Plan. Nor do surrounding circumstances show any intent on the part of Wright Brothers to so restrict the land. See Berger v. VanSweringen Co., *supra* at 103. In fact, Bloom's agreement was binding on him even if he was not able to obtain the desired zoning changes.

 No doubt adjacent land owners can enter into reciprocal agreements for the mutual benefit of their properties, which agreements would be binding on their successors in title. However, such agreements must be strictly construed. In construing the two contracts which purportedly give rise to the general plan in this case, we do not find any restrictive covenant. The purchase agreement for area 1 and the option for area 2, between Anteau and University Hills, were conditioned on the passage of zoning ordinances by the City Council of Toledo. However, there is nothing in either of these documents which evidences an intent to restrict permanently the three areas to the use of the land which the parties then contemplated. Although they may have intended that they would proceed in such a fashion, we are not free to imply that there was a covenant requiring such affirmative action. Since neither of the parties was bound in such a manner,

then neither would their successors in-interest be bound.

■ As we interpret the written agreements, University Hills and Anteau engaged in a joint and co-operative effort to secure changes in the Toledo zoning ordinances so as to permit construction of apartment buildings in area 3 and a shopping center in areas 1 and 2. This was the use which the parties then contemplated would be made of their respective parcels of land. The parties were represented by counsel, presumably familiar with Ohio law. If the parties had desired to restrict use of the land, such result could easily have been accomplished by inserting restrictions in the plat which University Hills did not record until December 4, 1967, or by inserting the restrictions in deeds. But this was not done. All that the parties did was to secure a change in the zoning ordinance.

Appellants purchased areas 1 and 2 from Anteau for the purpose of constructing dormitory buildings thereon. There is nothing in the option from Anteau or in the deed which would restrict such construction.

Appellants paid $51,000 to University Hills for an option and renewals on area 3, which were never exercised. This option likewise did not restrict the use of areas 1, 2 or 3.

University Hills knew that appellants were purchasing areas 1 and 2 for the purpose of constructing dormitories thereon, and that they had applied to Toledo City Council to change the zoning to permit such construction. The Toledo City Council changed the zoning so as to permit construction of dormitories in areas 1 and 2. Because of this change in zoning, a shopping center can no longer be constructed on said areas 1 and 2, but dormitories may be errected thereon.

The judgment of the District Court is reversed and the cause is remanded with instructions to dismiss the complaint.