**BOOKS A MILLION, INC., d/b/a Books & Co., Plaintiff,**

v.

**H & N ENTERPRISES, INC., d/b/a Truffle's Café & Catering, Defendant.**

No. C–3–99–108.

United States District Court, S.D. Ohio, Western Division.

March 16, 2001.

---

DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION FOR SEPARATE TRIAL (DOC. # 38), WITHOUT PREJUDICE TO RENEWAL; DEFENDANT'S MOTION TO STRIKE PORTION OF PLAINTIFF'S REPLY (DOC. # 50) SUSTAINED; PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. # 43) OVERRULED.

RICE, Chief Judge.

This litigation stems from a dispute over the proposed construction of a Joe Muggs newsstand and coffee shop ("Joe Muggs") in the Town & Country shopping center in Kettering, Ohio.[1] The Plaintiff plans to construct and to operate Joe Muggs within its Books & Company bookstore.' The Defendant operates Truffle's Café, a restaurant and catering service, in the Town & Country shopping center, and it opposes the addition of Joe Muggs. The Plaintiff filed its Complaint (Doc. # 1) on March 10, 1999, seeking, inter alia, a declaratory judgment regarding its right to open Joe Muggs. Pending before the Court are three Motions: (1) a Motion for Separate Trial (Doc. # 38) filed by the Defendant; (2) a Motion for Partial Summary Judgment (Doc. # 43) filed by the Plaintiff; and (3) a Motion to Strike Portion of Plaintiff's Reply (Doc. # 50) filed by the Defendant. After setting forth the facts underlying this litigation, the Court will address the foregoing Motions in the order that best facilitates its review.

## I. *Factual Background* [2]

This central issue in this lawsuit is the meaning of an exclusive-use provision in a sublease between the Plaintiff and the Defendant. The Plaintiff's predecessor in interest, Brooklyn Books, Inc., d/b/a Books & Co. ("Books & Co."), leased space in the Town & Country shopping center for the operation of a bookstore. Books & Co. subsequently subleased part of that space to the Defendant, where it operates its Truffle's Café.[3] In relevant part, the sublease grants the Defendant "the sole and exclusive license, right and privilege of operating a full-service restaurant and catering service, including the right to sell beer and wine, if incidental to the operation of said restaurant and catering service," within the Plaintiff's bookstore. Upon learning that the Plaintiff planned to construct and to operate Joe Muggs in the bookstore, the Defendant objected, claiming that such action would constitute a breach of the foregoing exclusive-use provision of the sublease. In response, the Plaintiff commenced the present litigation, seeking, inter alia, a declaratory judgment that its construction and operation of Joe Muggs will not violate the sublease.

## II. *Defendant's Motion for Separate Trial (Doc. # 38)*

The Defendant filed this Motion under Fed.R.Civ.P. 42(b),[4] seeking separate trials

---

1. It is undisputed that "Joe Muggs" will be a newsstand with a coffee bar. (Doc. # 43, Mountain affidavit at ¶ 9).

2. For purposes of ruling on the Plaintiff's Motion for Partial Summary Judgment, *infra*, the Court will construe the facts, and all reasonable inferences drawn therefrom, in a light most favorable to the Defendant, who is the non-moving party.

3. Although the Defendant operates Truffle's Café in space subleased from the Plaintiff, it does not appear that the Defendant's business is actually located inside the Books & Co. bookstore. Rather, Truffle's Café appears to be a separate establishment located next to the bookstore.

4. In relevant part, Rule 42(b) provides that the Court, "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues...."

"on the legal issue of the meaning of the lease agreement and sublease at issue in this matter, the legal significance of defenses asserted by [D]efendant and the legal and factual significance of other matters upon which [D]efendant desires discovery." (Doc. # 38 at 1). Having reviewed the foregoing Motion, it appears to the Court that the Defendant seeks to "trifurcate" this litigation for separate trials on (1) the proper interpretation of the lease and sublease, (2) its affirmative defenses, and (3) unspecified "other matters."

In response, the Plaintiff contends that the Defendant has failed to establish that bifurcation (or "trifurcation") would promote convenience and judicial economy. (Doc. # 39 at 3). In its reply Memorandum, however, the Defendant explains that it filed the Motion for Separate Trial "in an attempt to move this litigation forward." (Doc. # 41 at 1). According to the Defendant, its "primary reason for filing a motion for separate trial was to avoid a situation in which the Court might conclude that all of the claims of the parties have been resolved on summary judgment and that dismissal was appropriate." (*Id.* at 2). In other words, the Defendant filed its Motion to apprise the Court that resolution of the parties' dispute about the meaning of the lease and sublease will not terminate this litigation. The Defendant contends that certain affirmative defenses still will need to be resolved, and it argues that discovery is needed to address them. (*Id.* ).

█▌ Upon review, the Court will overrule the Defendant's Motion for Separate Trial (Doc. # 38), without prejudice to renewal. Insofar as the Defendant filed its Motion merely to stress the existence of its affirmative defenses, the Court takes note of those defenses and will discuss them more fully, *infra.* The Court will overrule the Motion for Separate Trial, however, given the Defendant's failure to explain how or why conducting separate trials in this matter would promote convenience or judicial economy.

In support of its Motion, the Defendant simply asks the Court "to determine the law applicable to this matter" and to clarify for the parties "what, if any, factual issues require further development." (Doc. # 38 at 2). In its analysis of the Plaintiff's Motion for Partial Summary Judgment (Doc. # 43), *infra,* the Court will attempt to satisfy this request. If the Defendant continues to believe that separate trials are necessary, however, it may file a renewed motion at a later date. Accordingly, the Defendant's Motion for Separate Trial (Doc. # 38) is overruled, without prejudice to renewal.

III. *Defendant's Motion to Strike Portion of Plaintiff's Reply (Doc. # 50)*

As noted above, the Plaintiff filed a Motion for Partial Summary Judgment on May 23, 2000. (Doc. # 43). Thereafter, on July 11, 2000, the Defendant filed the present Motion to Strike a portion of the Plaintiff's summary judgment reply brief, insofar as that pleading challenges the viability of the Defendant's affirmative defenses of estoppel, waiver and laches. In support of its Motion to Strike, the Defendant insists that the Plaintiff's Motion for Partial Summary Judgment and initial Memorandum in support thereof fail to address its affirmative defenses. According to the Defendant, the Plaintiff moved for summary judgment *only* on the issue of the Plaintiff's contractual rights under the terms of the parties' sublease. Given that the Plaintiff first challenged the three affirmative defenses in its reply Memorandum, the Defendant argues that the Plaintiff *is not* entitled to summary judgment on those defenses. As a result, the Defendant contends that its three affirmative defenses remain viable, even if the Plaintiff

obtains summary judgment on the issue of its contractual rights under the sublease. (Doc. # 50 at 1–2).

In response, the Plaintiff insists that it did raise the issue of the Defendant's affirmative defenses in its opening summary judgment Memorandum. In particular, the Plaintiff asserts that it properly met its initial burden of informing the Court and the Defendant of the basis for its Motion and of identifying portions of the record that demonstrate the absence of a genuine issue of material fact on these affirmative defenses. Indeed, the Plaintiff argues that it pointed to language in the sublease which precludes the introduction of extrinsic evidence and requires any amendment to the agreement to be in writing. According to the Plaintiff, the existence of such language in the sublease establishes that the Defendant cannot prevail on its affirmative defenses of estoppel, waiver and laches. As a result, the Plaintiff argues that the Defendant "was required to come forward with evidence that the parties' conduct had modified the [s]ublease or that enforcement of the integration clause to defeat [the Defendant's] defenses was otherwise barred." (Doc. # 51 at 2). Given the Defendant's failure to present such evidence, the Plaintiff insists that it is entitled to summary judgment on the three affirmative defenses. (*Id.* at 1–4).

■ Upon review, the Court will sustain the Defendant's Motion to Strike (Doc. # 50). Having examined the Plaintiff's initial Memorandum in support of its Motion for Partial Summary Judgment (Doc. # 43), the Court notes that it fails to mention the Defendant's affirmative defenses of estoppel, waiver and laches. A fair reading of the Memorandum suggests that

the Plaintiff has moved for summary judgment only on: (1) the issue of its rights under the terms of the sublease (in particular, whether the unambiguous terms of the sublease permit the Plaintiff to open Joe Muggs); and (2) certain counterclaims integrally related to the sublease and the Plaintiff's rights thereunder. (*See, generally,* Doc. # 43). Although the Plaintiff fully addresses the foregoing issues, its Memorandum in support of summary judgment is silent regarding the Defendant's affirmative defenses of estoppel, waiver and laches. (*Id.*). The Plaintiff addresses the affirmative defenses only in its reply Memorandum (Doc. # 49 at 10–13).[5]

In opposition to the Defendant's Motion to Strike, however, the Plaintiff correctly notes that it moved for summary judgment on the basis that the sublease at issue is an unambiguous, fully integrated document—a fact which, if true, would preclude the Defendant from introducing extrinsic evidence to contradict the terms of that agreement. (Doc. # 51 at 1–2). According to the Plaintiff, the Defendant's affirmative defenses necessarily are "nullifie[d]" by its summary judgment argument that the sublease precludes the introduction of extrinsic evidence and requires any amendments to be in writing. (*Id.*). In other words, the Plaintiff suggests that its summary judgment argument about the sublease being "fully integrated" goes to the issue of its rights under that agreement *and* also constitutes an oblique reference to the non-viability of the Defendant's affirmative defenses.

The Court finds the Plaintiff's argument to be unpersuasive. It simply is not clear from the Plaintiff's initial summary judg-

---

**5.** Although it addresses the affirmative defenses in its reply Memorandum, the Plaintiff also insists, contrary to the Defendant's argument, that its Motion for Summary Judgment and *initial* Memorandum are "predicated on a finding of no genuine issue of material fact as to defenses." (Doc. # 49 at 10).

ment Memorandum that it has moved for judgment as a matter of law on the issue of its rights under the sublease *and* on the Defendant's three affirmative defenses. Although the Plaintiff may believe that the language of the sublease nullifies the Defendant's affirmative defenses, it has failed to apprise the Defendant of that fact anywhere in its initial summary judgment Memorandum.[6]

■ In the context of summary judgment, it is well settled that the moving party *always* bears the initial responsibility of informing the district court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This initial burden remains with the moving party, even when the issue involved is one on which the non-movant will bear the burden of proof at trial, such as the Defendant's affirmative defenses in the present case. *Id.; see also Stillman v. Travelers Ins. Co.*, 88 F.3d 911, 913–914 (11th Cir.1996) (recognizing that a district court may not enter summary judgment against a non-movant defendant on its affirmative defenses if those defenses have not been raised in the plaintiff's motion); *Navistar Intern. Transp. Corp. v. Freightliner Corp.*, 1998 WL 786388, 49 U.S.P.Q.2d 1116 (N.D.Ill.1998) (noting that the moving party failed to meet its initial summary judgment burden when it ignored the non-movant's affirmative defenses).

Given the Plaintiff's failure to address the Defendant's affirmative defenses in its initial summary judgment Memorandum, the Defendant had no obligation in its opposing Memorandum to demonstrate a genuine issue of material fact with respect to those defenses. *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 658 (6th Cir.1999) (recognizing that the non-movant's burden arises only after the movant meets its initial burden). Furthermore, it is improper for the Plaintiff to address the three affirmative defenses for the first time in its reply Memorandum. *Aetna Cas. and Sur. Co. v. Leahey Const. Co., Inc.*, 219 F.3d 519, 545 (6th Cir.2000). Accordingly, the Defendant's Motion to Strike (Doc. # 50) will be sustained. In its analysis of the Plaintiff's Motion for Partial Summary Judgment (Doc. # 43), *infra*, the Court will not consider the Plaintiff's arguments, raised in its reply Memorandum, regarding the Defendant's affirmative defenses of estoppel, waiver and laches. Regardless of the Court's ruling on the Plaintiff's Motion, those affirmative defenses will remain viable in this litigation, as the Plaintiff has not properly moved for summary judgment on them.

## IV. Plaintiff's Motion for Partial Summary Judgment (Doc. # 43)

Before turning to the issues raised in the Plaintiff's Motion for Partial Summary Judgment, the Court will first set forth the relative burdens of the parties once a mo-

---

**6.** Parenthetically, it is not clear to the Court why the Defendant's affirmative defenses would be "nullified," even if the sublease at issue is fully integrated and the Plaintiff's interpretation of that agreement is correct. In other words, even if the sublease permits the Plaintiff to operate Joe Muggs, this fact alone does not appear to negate the Defendant's affirmative defenses. Indeed, by their very nature, the affirmative defenses presuppose that the terms of the sublease permit the Plaintiff to operate a coffee shop. In other words, the affirmative defenses of estoppel, waiver and laches suggest that while the sublease may permit the operation of Joe Muggs, the Plaintiff is estopped from doing so for some reason, the Plaintiff has waived its contractual right to do so, or the Plaintiff should be prevented from doing so by the equitable doctrine of laches. If the terms of the sublease alone precluded the Plaintiff from operating the coffee shop, the Defendant would have no need to assert its affirmative defenses.

tion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548. *See also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991) The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial." (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law under Fed.R.Civ.P. 50. *Street v. J.C.*

*Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also Michigan Protection and Advocacy Service, Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff"). Rather, Rule 56(e) "requires the non-moving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations

must be left to the fact-finder. 10A Charles Alan Wright, et al., *Federal Practice and Procedure* § 2726.

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). *See also, L.S. Heath & Son, Inc. v. AT & T Information Systems*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins*, 953 F.2d 909, 915 n. 7 (5th Cir.) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ...."), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

With the foregoing standards in mind, the Court turns now to the Plaintiff's Motion for Partial Summary Judgment (Doc. # 43). As noted, *supra*, the Plaintiff seeks summary judgment on its claim for declaratory judgment regarding its right to operate Joe Muggs under the terms of the parties' sublease and on certain counterclaims which also depend upon the Plaintiff's rights under the sublease. In support of its Motion, the Plaintiff raises three arguments. *First*, the Plaintiff asserts that the unambiguous terms of the sublease permit it to operate Joe Muggs. *Second*, the Plaintiff contends that the sub-lease is a fully integrated document. As a result, the Plaintiff insists that the Defendant may not introduce extrinsic evidence of "intentions" and "understandings" that are not found in the sublease. *Third*, the Plaintiff argues that giving the key words of the sublease their "ordinary meaning" will not result in "manifest absurdity." (Doc. # 43 at 5–15). In response, the Defendant argues that the pertinent language of the sublease *is* ambiguous, that the sublease *is not* a fully integrated document, and that interpreting the sublease in the manner urged by the Plaintiff *will* result in "manifest absurdity." The Defendant also raises additional arguments that implicate several maxims of contract interpretation under Ohio law.[7]

Upon review, the Court will overrule the Plaintiff's Motion for Partial Summary Judgment, insofar as it relates to the meaning of the exclusive-use provision in the parties' sublease. It is well settled that general contract-law principles apply to the construction and interpretation of the sublease provision at issue. *Timber Ridge Investments, Ltd. v. Marcus*, 107 Ohio App.3d 174, 667 N.E.2d 1283 (1995). "Under Ohio law, courts are required to give unambiguous contract provisions their plain meaning." *Winningham v. North American Resources Corp.*, 42 F.3d 981, 985 (6th Cir.1994). If a contract is unambiguous, the language of the contract controls and "[i]ntentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence." *Aultman Hosp. Ass'n. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 53, 544 N.E.2d 920, 923 (1989). A contract provision is ambiguous if it is reasonably susceptible to two or more interpretations. *United States Fidelity and Guaranty Co. v. St. Elizabeth Medical Center*, 129 Ohio App.3d 45, 716 N.E.2d 1201, 1208 (1998);

---

7. The parties agree that the present action is governed by Ohio substantive law.

*United Telephone Co. v. Williams Excavating, Inc.,* 125 Ohio App.3d 135, 153, 707 N.E.2d 1188, 1200 (1997). "If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." *State ex rel. Parsons v. Fleming,* 68 Ohio St.3d 509, 628 N.E.2d 1377, 1379 (1994). If ambiguity exists, however, then the meaning of a contract is a question of fact. *Amstutz v. Prudential Ins. Co. of America,* 136 Ohio St. 404, 26 N.E.2d 454 (1940).

Bearing the foregoing principles of Ohio contract law in mind, the Court turns now to the pertinent language of the parties' sublease. The exclusive-use provision of that agreement provides:

> Lessor [Books & Co.] hereby grants Lessee [Truffle's] the sole and exclusive license, right and privilege of operating a full-service restaurant and catering service, including the right to sell beer and wine, if incidental to the operation of said restaurant and catering service, within Lessor's store located at 350 East Stro[o]p Road, Dayton, Ohio 45429.

(Doc. # 43, Mountain affidavit at Exh. A, Section 1(a)).

The present dispute concerns the meaning of the phrase "full-service restaurant and catering service." In its Memorandum, the Plaintiff argues that the foregoing phrase is unambiguous, and that Joe Muggs does not qualify as a "full-service restaurant and catering service," as a matter of law. (Doc. # 43 at 7–9). In support of its argument that Joe Muggs does not qualify as a full-service restaurant, the Plaintiff cites *Rotellini v. West Carrollton*

*Bd. of Zoning Appeals,* 64 Ohio App.3d 17, 580 N.E.2d 500 (1989).[8] In *Rotellini,* the court reviewed the defendant's denial of the plaintiff's application to operate a drive-through carry-out store in the City of West Carrollton. The West Carrollton Board of Zoning Appeals denied the plaintiff's application, finding that the proposed store constituted a "drive-in restaurant," which was a non-permitted use in the location at issue. *Id.* at 503. Upon review, the Ohio Second District Court of Appeals disagreed, concluding that the plaintiff's proposed use did not qualify as a "restaurant" under any reasonable definition of that term. *Id.* at 505. In reaching this conclusion, the *Rotellini* court examined various definitions of the term restaurant and found that the appellant's proposed "drive-through" did not fit under any of them.

Herein, the Plaintiff seizes upon the *Rotellini* court's reference to a definition of the term "restaurant" found in Ohio's liquor control law, which provides, in part:

> "Restaurant" means a place located in a permanent building provided with space and accommodations wherein, in consideration of the payment of money, hot meals are habitually prepared, sold and served at noon and evening, as the principal business of the place. "Restaurant" does not include pharmacies, confectionary stores, lunch stands, night clubs, and filling stations.

*Id.* at 504–505 (quoting Ohio Revised Code § 4301.01(A)(12)).

Given that the proposed Joe Muggs will not prepare and serve hot meals at noon

---

8. As noted above, the Plaintiff also argues that Joe Muggs does not qualify as a "catering service." (Doc. # 43 at 9). In support of this proposition, the Plaintiff cites Ohio Revised Code § 3717.01(G), which defines a "catering service" as "a food service operation where food is prepared for serving at a function or event held at an off-premises site, for a charge determined on a per-function or per-event basis." In response, the Defendant does not argue that Joe Muggs qualifies as a "catering service." Instead, the Defendant argues only that Joe Muggs constitutes a "full-service restaurant" within the meaning of the parties' sublease. Consequently, for purposes of its analysis herein, the Court will focus solely on the meaning of the phrase "full-service restaurant," as used in the sublease.

and in the evening, the Plaintiff contends that it does not qualify as a "restaurant," as a matter of law, under the definition set forth in Ohio's liquor control law. (Doc. # 43 at 8–9). Although the Court does not dispute this proposition, it is unpersuaded that the definition of the term "restaurant" set forth in § 4301.01(A)(12) is dispositive. The standard dictionary definition of the term "restaurant" is far more encompassing than the statutory definition contained in Ohio's liquor control law. *See* Webster's Unabridged Third New International Dictionary at 1936 (1976) (defining a "restaurant" as "an establishment where refreshments or meals may be procured by the public"). Indeed, as the Second District Court of Appeals noted in *Rotellini*, the term "restaurant" is susceptible to varying definitions:

> The term "restaurant" is defined variously as "[a] place where meals are served to the public," The American Heritage Dictionary of the English Language, New College Edition (1976) 1108, "an establishment where refreshments or meals may be procured by the public: a public eating house," Webster's Third New International Dictionary (1986) 1936, and "a place where food is prepared and served inside to be consumed on tables, although it may be taken out and consumed in cars," 3 Anderson, American Law of Zoning (3 Ed.1986) 185, Section 17.65. Under former R.C. 3731.01(B), 1953 H.B. No. 1, a restaurant was defined as a "place where meals or lunches are served for consideration * * *."

*Rotellini*, 580 N.E.2d at 504.

In its Memorandum opposing summary judgment, the Defendant contends that the term "restaurant" is synonymous with the words "eating house," "eating place," "dining room," "café," "beanery," and "eatery." (Doc. # 46 at 9) (citing Webster's New World Thesaurus at 383 (1974)). In addition, the Defendant notes that the term "restaurant" encompasses various types of establishments, including a "café," "dining room," "inn," "coffee shop," "coffee house," "coffee room," "luncheonette" and "canteen." (*Id.*). Notably, the Plaintiff does not dispute that the term "restaurant" has been defined in the foregoing ways.

In light of the varying definitions set forth above, the Court concludes that the term "restaurant" is ambiguous. In addition, the Court notes that Joe Muggs appears to fit within one or more of the possible meanings of that term. The Plaintiff has provided the Court with the following description of the planned Joe Muggs:

> Joe Muggs is a newsstand with a coffee bar. Its atmosphere is based on the imaginary life of Joe Muggs, an explorer and pilot who traveled the world in search of great coffee and adventure. The coffee shop portion features whole bean gourmet coffees, pre-made homemade cookies, other related treats and coffee-related gift items.... Joe Muggs will offer for sale approximately nine types of pre-made cookies, approximately eight different types of pre-made cakes in single serving portions, and a small tray of bagels. In addition to coffee and pre-made bakery items, Joe Muggs will offer for sale whole coffee beans, a small assortment of packaged candy, bottled waters, juice and soft drinks.

(Doc. # 43, Mountain affidavit at ¶ 9–).

Based on the foregoing affidavit, Joe Muggs appears to qualify as an establishment where refreshments may be procured by the public. If so, it fits within at least one recognized dictionary definition of the term "restaurant." *See* Webster's Unabridged Third New International Dictionary at 1936 (1976) (defining a "restaurant" as "an establishment where refreshments ... may be procured by the

public"). Joe Muggs also appears to qualify as an "eating place," "café," "beanery" or "eatery." As noted above, these words are synonymous with the term "restaurant." Finally, Joe Muggs appears to qualify as a "coffee shop" or "coffee house," which again would make it a type of "restaurant."

Given that the term "restaurant" is ambiguous, and given that Joe Muggs appears to fit within one or more possible meanings of that term, the Court turns its attention to the phrase "full-service." As noted, *supra,* the exclusivity provision of the parties' sublease applies to only a subset of "restaurants." In particular, the sublease grants the Defendant the exclusive right to operate a "full-service" restaurant. In its Memorandum, the Plaintiff makes no attempt to define the phrase "full-service." Rather, it argues only that Joe Muggs does not qualify as a "restaurant," as a matter of law, in light of the definition set forth in Ohio's liquor control law. In its Memorandum opposing summary judgment, however, the Defendant contends that the phrase "full-service" has been defined to mean "providing comprehensive service of a particular kind." (Doc. # 46 at 11) (quoting Merriam Webster Collegiate Dictionary (1999)).

▮▮▮ Upon review, the Court concludes that the adjective phrase "full-service," as used in the sublease, does not resolve the ambiguity inherent in the term "restaurant." Indeed, it is impossible to determine from the sublease what additional feature distinguishes the subset of "full-service restaurants" from the larger group of "restaurants" generally. That distinguishing characteristic could be the presence of a sit-down eating area on the premises, which the proposed Joe Muggs will provide,[9] or it could be the existence of a wait staff or any number of other things, including the availability of hot meals prepared on the premises. On the face of the sublease alone, it simply is not possible to determine whether Joe Muggs qualifies as a "full-service restaurant." If that phrase is defined as a place where refreshments are served to members of the public, who may consume their refreshments in a sit-down eating area, then *both* Joe Muggs and Truffles would appear to qualify as "full-service restaurants," in violation of the exclusivity provision of the parties' sublease. On the other hand, if, under the sublease, a "full-service restaurant" requires a comprehensive menu or the availability of hot meals prepared on the premises, then Joe Muggs would not appear to meet that definition.[10] Given that the phrase "full-service restaurant" in the parties' sublease is susceptible to two or more reasonable interpretations, the Court concludes that it is ambiguous, and consideration of extrinsic evidence will be appropriate to resolve the ambiguity.[11]

---

9. *See* Doc. # 46, Argue affidavit at ¶ 4 ("The Joe Muggs cafés have seating for patrons and they are welcome and expected to consume beverages, cookies and pastries on the site.").

10. The Court does not intend for these examples to constitute the only possible meanings of the phrase "full-service restaurant." The Court cites them only to illustrate the ambiguity in the meaning of that phrase.

11. In light of this conclusion, the Court need not address the Plaintiff's third argument, which is that no "manifest absurdity" would result from giving the words "full-service res-

taurant" their "ordinary meaning." (Doc. # 43 at 12–15). The Ohio Supreme Court addressed the "manifest absurdity" test in *Alexander v. Buckeye Pipe Line Co.,* 53 Ohio St.2d 241, 374 N.E.2d 146, 150 (1978). Therein, the court reasoned that "common words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." As noted, *supra,* however, the phrase "full-service restaurant" in the parties' sublease is ambiguous because it is susceptible to

Consequently, the Court is unpersuaded by the Plaintiff's argument that the terms of the sublease clearly and unambiguously allow it to open Joe Muggs.[12] As a result, the Plaintiff is not entitled to summary judgment, on its claim or the Defendant's counterclaims, on the basis of the purportedly "plain" and "unambiguous" language of the sublease.

Having determined that the phrase "full-service restaurant" *is* ambiguous, as used in the parties' sublease, the Court need not determine whether the sublease is a "fully integrated" document, as the Plaintiff contends (Doc. # 43 at 10), or only a "partially integrated" document, as the Defendant asserts (Doc. # 46 at 14). With respect to the issue of integration, "Ohio law dictates that '[w]here the parties, following negotiations, make mutual promises which thereafter are integrated into an unambiguous written contract, duly signed by them, courts will give effect to the parties' expressed intentions[, and] [i]ntentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence." *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 377 (6th Cir. 1999) quoting *Astor v. International Bus. Machines Corp.*, 7 F.3d 533, 539 (6th Cir. 1993) (internal quotation marks and citation omitted). It is well settled, however, "that ambiguities in an integrated contract justify the use of parol evidence for their resolution." *Clarke v. Hartley*, 7 Ohio App.3d 147, 454 N.E.2d 1322, 1326 n. 3 (1982). Consequently, regardless of whether the sublease is fully integrated or only partially integrated, extrinsic evi-

dence will be admissible to interpret the meaning of the ambiguous phrase "full-service restaurant." *Id.*

Finally, the Court turns to the Plaintiff's contention that the words "full-service restaurant" must be construed narrowly because Section 1(a) of the sublease restricts the use of real estate. (Doc. # 43 at 7–8). In support of this argument, the Plaintiff cites *Loblaw, Inc. v. Warren Plaza, Inc.*, 163 Ohio St. 581, 127 N.E.2d 754 (1955), *Driscoll v. Austintown Associates*, 42 Ohio St.2d 263, 328 N.E.2d 395 (1975), and *Rite Aid of Ohio, Inc. v. Marc's Variety Store, Inc.*, 93 Ohio App.3d 407, 638 N.E.2d 1056 (1994). These cases stand for the proposition that "[t]he general rule, with respect to construing agreements restricting the use of real estate, is that such agreements are strictly construed against limitations upon such use, and that all doubts should be resolved against a possible construction thereof which would increase the restriction upon the use of such real estate." *Loblaw*, 127 N.E.2d at 760; *see also Driscoll*, 328 N.E.2d at 404 (quoting *Loblaw* ); *Rite Aid of Ohio*, 638 N.E.2d at 1060 ("Ohio law requires that the language of the exclusive-use clauses should be narrowly construed").

■ Upon review, the Court rejects the argument that it must accept the Plaintiff's interpretation of the sublease, as a matter of law, because the sublease grants the Defendant the exclusive right to operate a "full-service restaurant" and, therefore, constitutes a disfavored restriction on the use of land. The Court recognizes that

two or more reasonable interpretations. As a result, the Court cannot ascribe any "plain and ordinary meaning" to the words "full-service restaurant."

**12.** Having determined that the phrase "full-service restaurant" is ambiguous, the Court need not address the Defendant's argument that other principles of contract interpreta-

tion also permit the introduction of extrinsic evidence to determine the parties' intent. (*See* Doc. # 46 at 12–16). Once it has been determined that a contract provision is ambiguous, Ohio law expressly allows the use of extrinsic evidence to resolve the ambiguity. *See, e.g., Shifrin v. Forest City Enterprises, Inc.*, 64 Ohio St.3d 635, 597 N.E.2d 499, 501 (1992).

Ohio law "does not favor restrictions on the use of property." *Driscoll*, 328 N.E.2d at 404. As a result, in Ohio, as in nearly every state, there is a policy favoring the free and unrestricted use of land. *Bove v. Giebel*, 169 Ohio St. 325, 329, 159 N.E.2d 425 (1959). Indeed, as the Plaintiff notes, Ohio adheres to a maxim of contract interpretation which provides that land-use restrictions should be strictly construed against limitations on the use of real estate, and all doubts should be resolved against a construction that increases restrictions on the use of land. *See, e.g., University Hills, Inc. v. Patton*, 28 Ohio Misc. 93, 427 F.2d 1094, 1099–1100 (6th Cir.1970). This rule of contract interpretation applies to exclusive-use provisions in lease agreements such as the one in the present case. *Rite Aid of Ohio*, 638 N.E.2d at 1060.

■ Although the Court does not dispute the legal principles set forth above, those principles do not warrant the entry of summary judgment in favor of the Plaintiff. The foregoing maxim of contract interpretation does not establish, as a matter of law, that the Plaintiff is entitled to operate Joe Muggs under the terms of the parties' sublease. To the contrary, when a restrictive-use provision is ambiguous, extrinsic evidence may be considered to determine the parties' intent, despite the general rule favoring the unrestricted use of real estate. In other words, extrinsic evidence may resolve the doubts about the meaning of an ambiguous restrictive covenant, thereby overcoming the general rule that such covenants must be narrowly construed against restrictions on the use of property.

Although the parties have not addressed the interrelationship between the rule of strict construction and the use of extrinsic evidence to determine the intent behind an ambiguous land-use restriction, the Court's own research reveals that the rule of strict construction does not preclude the introduction of extrinsic evidence of intent. Indeed, the maxim of contract interpretation discussed above is nearly universal in application, and courts in Ohio and across the country have recognized that it may be overcome with extrinsic evidence demonstrating the true intentions of the parties. For example, in *Driscoll*, 328 N.E.2d at 404, the Ohio Supreme Court recognized, through its analysis, that extrinsic evidence of the parties' intent may defeat the general rule favoring a strict construction of ambiguous land-use restrictions. Therein, the appellees argued that there was "no doubt" about the original intent behind the restrictive covenants at issue. *Id.* The Ohio Supreme Court rejected this argument, noting that there was "insufficient evidence" to establish the intent behind the restrictive covenants. *Id.* As a result, the *Driscoll* court reasoned that "the effect of the restrictive covenants in this case must be determined solely from their language." *Id.* Only *then* did the court proceed to apply the general rule that restrictions on the use of land should be strictly construed against such limitations. *Id.; see also Belleview Const. Co., Inc. v. Rugby Hall Community Ass'n, Inc.*, 321 Md. 152, 582 A.2d 493, 495 (1990) ("If an ambiguity is present, and if that ambiguity is not clearly resolved by resort to extrinsic evidence, the general rule in favor of the unrestricted use of property will prevail and the ambiguity in a restriction will be resolved against the party seeking its enforcement."); *K & K Food Services, Inc. v. S & H, Inc.*, 3 P.3d 705, 709 n. 11 (Okla.2000) (noting that the intent of parties, as evidenced by extrinsic evidence when a restrictive-use provision is ambiguous, prevails over the general rule that restrictive covenants must be strictly construed in favor of unencumbered land use); *Barthelmes v. Keith*, 732 A.2d 644, 647 (Pa.Super.1999) (recognizing

that while restrictive-use agreements must be narrowly construed, courts may consider extrinsic evidence when such agreements are ambiguous); *Yogman v. Parrott*, 325 Or. 358, 937 P.2d 1019, 1022–1023 (1997) (reasoning that extrinsic evidence of the parties' intent prevails over the maxim requiring strict construction of restrictive covenants); *Addison County Automotive, Inc. v. Church*, 144 Vt. 553, 481 A.2d 402, 404–405 (1984) (noting that the rule requiring strict construction of a restrictive covenant in a lease does not preclude consideration of extrinsic evidence if the covenant is ambiguous); *Dart Drug Corp. v. Nicholakos*, 221 Va. 989, 277 S.E.2d 155, 157 (1981) (recognizing that the intention of the parties may be determined through extrinsic evidence when a restrictive-use provision is ambiguous, despite the rule of strict construction against such covenants); *Ware Construction Co., Inc. v. Thomas*, 357 So.2d 452, 454 (Fla.App.1978) (noting that courts may consider extrinsic evidence when land-use restrictions are ambiguous, notwithstanding the general rule of construction which favors the free use of land); *Gwinn v. Cleaver*, 56 Wash.2d 612, 354 P.2d 913, 915 (1960) (recognizing that if the restrictive covenant at issue were ambiguous, reliance on extrinsic evidence would be proper, despite the rule requiring strict construction of such covenants). Given that the general rule of contract interpretation discussed above is not dispositive, that rule does not entitle the Plaintiff to judgment as a matter of law. Accordingly, the Plaintiff's Motion for Partial Summary Judgment (Doc. # 43) will be overruled, insofar as it relates to the Plaintiff's right to operate Joe Muggs under the terms of the parties' sublease.

█ The Plaintiff's Motion for Partial Summary Judgment also will be overruled, insofar as it belatedly addresses the Defendant's affirmative defenses of estoppel, waiver and laches. As noted above, the Plaintiff addresses these affirmative de-fenses for the first time in its reply Memorandum (Doc. # 49 at 10–13). It is well settled, however, that a party may not raise an issue for the first time in a reply brief. *Aetna Cas. and Sur. Co. v. Leahey Const. Co., Inc.*, 219 F.3d 519, 545 (6th Cir.2000). Consequently, the Court will not consider the Plaintiff's arguments about the non-viability of the Defendant's affirmative defenses.

## V. *Conclusion*

Based on the reasoning and citation of authority set forth above, the Defendant's Motion for Separate Trial (Doc. # 38) is overruled, without prejudice to renewal. The Defendant's Motion to Strike Portion of Plaintiff's Reply (Doc. # 50) is sustained. The Plaintiff's Motion for Partial Summary Judgment (Doc. # 43) is overruled.